NATIONAL LABOR RELATIONS BOARD v. LOCAL UNION 1418, GENERAL LONGSHORE WORKERS, INTERNATIONAL LONGSHORE-MEN'S ASSN., A.F.L.

No. 14835.

United States Court of Appeals Fifth Circuit.

May 14, 1954.

George J. Bott, Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, David P Findling, Associate Gen. Counsel, Arnold Ordman, James A. Ryan, Attys., National Labor Relations Board, Washington, D. C., Charles M. Paschal, Jr., Chief Law Officer, National Labor Relations Board, New Orleans, La., for petitioner.

Ralph D. Dwyer, Jr., Alvin J. Liska, New Orleans, La., for respondent.

Before STRUM and RIVES, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

On December 19, 1949, Ivy P. Boudreaux filed with the National Labor Relations board, called Board, charges that the International Longshoremen's Association Local No. 1418, AFL, called Union, had and was engaged in unfair labor practices, within the meaning of Section 8(b) (1), 29 U.S.C.A. § 158(b) (1), but for some reason the Board did not issue its complaint against the Union until May 29, 1952. The complaint recited (Paragraph 6 and 7) that Boudreaux had charged respondent, "its officers, agents and members, did on or about June 22, 1949, cause" the corporations named [1] in Paragraph I and other stevedoring corporations doing business in the port of New Orleans, to refuse employment to complainant because of his non-membership in respondent Union, and had continued to do so ever since.

The Trial Examiner scheduled a hearing for June 23, 1952, and respondent answered on June 6th of that year, denying the charges generally.

The hearing began on time and the Intermediate Report was filed on September 15, 1952, finding respondent guilty of the charges and recommending action by the

[1] "I. Southern Stevedoring Company, Inc., (Longshore Division of Lykes Brothers Steamship Company, Inc.); United Stevedoring Corporation; Ryan Stevedoring Company, Inc.; and Strachan Shipping Company are Louisiana corporations operating in the port of New Orleans, Louisiana, where they are engaged in stevedoring operations employing Longshoremen who handle waterborne cargo." (R. 14)

Board.[2] The Board approved the Examiner's findings in all respects.[3]

The Board seeks enforcement and respondent opposes on the sole ground that the charges are not supported by the evidence.

The Examiner stated the issue as follows:

"The gravamen of the complaint here is that the Respondent Union, after expelling Ivy P. Boudreaux from membership for reasons other than nonpayment of dues, blacklisted him from employment in the Port of New Orleans, first as a longshoreman and later in other capacities as well, and during the period covered by the complaint has caused waterfront employers to honor that blacklisting."

The Taft-Hartley Act became effective August 22, 1947, but allowed contracts theretofore made between Union and employers to continue, in this instance for approximately one year. It had been entered into three days before the Act went into effect, August 19, 1947, and provided that only members of the two unions, Local 1418 and 1419 (white and colored) should "be hired * * * in the loading and unloading of ships under this contract." After the amendment, in view of Section 102, 29 U.S.C.A. § 158 note, such provisions were eliminated. Instead, the contracts, where employees are organized, require applicants, as a condition of employment, to become union members on or after the 30th day from the beginning of their employment, or the effective date of the applicable agreement, whichever is the longer.

Local No. 1418 and 1419 were certified December 6, 1949, as having been chosen at an election by the stevedore employees. The contracts provided that men should be supplied by foremen or superintendents only. The report of the Examiner described the method of hiring as follows:

"In actual practice longshoremen are usually hired by foremen, almost all of whom are members of the Union, although such membership has never been contractually required as a condition of their employment. Foremen are not necessarily attached to any given stevedoring company. Many work for different companies at different times as their services are required, and when not working as foremen seek employment as longshoremen on the gangs of other foremen. The hiring practices followed, generally speaking are these: Each stevedoring company has a number of regular or extra foremen listed with it. When a ship arrives in port, the stevedoring company working it will determine the number of longshore gangs required, and will contact the necessary number of foremen so that each may assemble his own gang. The hiring of longshoremen is done each day at 'shape-ups'. Foremen seeking gangs and longshoremen seeking work appear at these 'shape-ups' where all hiring is done, and the gangs necessary for the day's work are assembled. A foreman who works steadily as such will usually have a steady crew that follows him about from job to job, and he will give preference to his steady men, hiring extras from whomever is around. Long-

2. By " * * * finding that the Respondent had engaged in and was engaging in certain unfair labor practices in violation of the Act, and recommending that it cease and desist therefrom and take certain affirmative action, as set forth in the copy of the Intermediate Report attached hereto. Thereafter, the Respondent filed exceptions to the Intermediate Report and a brief; the General Counsel filed a brief in support of the Intermediate Report." (R. 32)

3. "The Board has reviewed the rulings of the Trial Examiner and finds that no prejudicial error was committed. The rulings are hereby affirmed. The Board has considered the Intermediate Report, the exceptions, the briefs, and the entire record in this case, and hereby adopts the findings, conclusions, and recommendations of the Trial Examiner." (R. 33)

shoremen who are not on steady gangs will go from foreman to foreman until they succeed in finding one that requires his services for that day. Union men who are prepared to work steadily and are good workers usually experience little difficulty in finding placement on a regular gang."

Boudreaux began work as a stevedore about 1935, joining Local No. 1418 shortly thereafter and for some ten years found no difficulty in obtaining employment in one capacity or another. In May, 1945, he was appointed secretary-treasurer by the president of said Union, Al Chittenden, and was subsequently elected to that position by the membership. In the fall of 1947, while so serving, Boudreaux became involved, along with one Joseph Doane, the Union's vice president, in a controversy with Chittenden, about the affairs of the Union and the manner in which they were being administered. These two filed with the South Atlantic and Gulf Coast District of the International Longshoremen's Association, charges that Chittenden had misappropriated union funds and was conducting the Union's affairs "in a dictatorial manner". In turn, Chittenden induced the executive board to suspend Doane and Boudreaux upon charges of removing union records from the hall without the knowledge of the Union.

A hearing was had by the District Board and while Chittenden was cleared of the charge of misappropriating funds, it was found that he had assumed too much authority in conducting the Union's affairs. The Board made certain recommendations for the future handling and auditing of local accounts, as well as for "a more democratic and cooperative spirit with the membership in handling the affairs of the Local". It also recommend-

ed that Doane and Boudreaux be restored to their offices without loss in pay.

At subsequent meetings of Local 1418, the row between Chittenden on the one part, and Doane and Boudreaux on the other, broke out afresh, they contending he had suppressed parts of the District Board's report. Whereupon he called on the Union to again suspend them but this was voted down. Notwithstanding this action of the Union, Chittenden ordered them from the hall with the statement they were suspended. The matter again found its way to the office of International President Ryan in New York, who appointed a representative to conduct further investigation of the Local's affairs. In January, 1948, Boudreaux and Doane were again restored and were ordered to be paid their salaries while out of office.

The controversy again went back to the Local where other members of the Union began taking part by making charges against Doane and Boudreaux, and in March, 1948, they resigned their offices. Subsequently they were formally expelled on charges not disclosed by the record. Appeals to the District authorities were unsuccessful.

Boudreaux has never given up the fight and it has continued on through the years.

The N.L.R.B. found that until the controversy arose between Chittenden and Boudreaux, the latter never had any trouble obtaining employment on the waterfront, including the period following his resignation as secretary-treasurer of the Union in January, 1948, and until March of that year when he was expelled. Without going into great detail, the reason for his inability to get work on the New Orleans waterfront is, we think, correctly summarized by the Trial Examiner's report quoted in footnote.[4] The examiner

4. "At about the time of his expulsion, Boudreaux was scheduled to work as a longshoreman foreman, loading a ship for the Strachan Company. When he reported for that assignment shortly after his expulsion, he was told that he could no longer be hired as a foreman because

Wharf Superintendent Mohre of Strachan had complained that he was not producing enough work. That same afternoon, Boudreaux called on Mohre to inquire whether the reason given was a true one. Mohre assured Boudreaux that he had always regarded him as a good work-

reviews many other instances of Chittenden communicating with persons, both with the stevedoring companies and in the Unions, requesting that Boudreaux should not be given employment and that he be "knocked off", that is, refused employment, which we also find fully supported by the record and not necessary to discuss at length here. To give a few illustrations, it appears that James Tankerson, a walking delegate for Local No. 1419 (colored) testified that Chittenden, shortly after the expulsion of Boudreaux and Doane, stated they were no longer members of Local 1418 and requested that they be "knocked off", or denied employment. Paul Guillory, also a walking delegate for Local 1419, confirmed the testimony of Tankerson about Chittenden saying that Boudreaux was no longer a member of Local 1418 and should be "knocked off" if he tried to get employment on the waterfront. The evasive character of the latter's testimony reflects very clearly that he told only what he was compelled to tell, but there is no doubt that all connected with the stevedoring business both on the side of employers and employees knew full well what "knocking off" in this instance meant.

Dave A. Dennis was president of Local 1419 and had worked as a longshoreman since 1935. He testified that in 1948 he had a telephone call from Chittenden prior to their convention of that year and gave testimony as indicated in the footnote.[5] It was respondent's contention

---

er, both as a longshoreman and as a foreman. Mohre went on to explain however, that he, too, had 'bosses', and that he had received orders no longer to hire Boudreaux as a foreman until Boudreaux got 'this business straightened out with Mr. Chittenden.'

"That same day Boudreaux obtained a job with Nicky Ross, a foreman employed by Strachan, loading supplies on board ship. As has already been noted, the job of loading stores was one considered outside the coverage of the Union's closed-shop contract. Boudreaux continued to work under Nicky Ross, apparently in the same capacity, until some time toward the end of April. After the work gave out, Boudreaux never again was able to find work on the riverfront, except, as hereinafter more fully noted, as a water-boy and sack-sewer, categories carrying hourly rates about half that paid longshoremen."

5. Testimony of Dave A. Dennis:
"Q. Could you relate to us just what was said in the conversation with Mr. Chittenden? First of all, I would like to ask you who made the call? A. Al did.

"Q All right. What was said in the telephone call? A. When he called, he said, 'I am calling to let you know Ivy Boudreaux is not a member of 1418 any more and where you see him working, knock him off.' 'I told all of the delegates already and I thought I would call you.'

"Q. Did you say anything? A. Did I tell him—

"Q. Did you say anything? You would or would not? A. I said, 'I won't knock him off until his appeals have been heard through the various channels that we have to go through.'

*    *    *    *    *

"Q. Did you have any conversations with a Mr. Mohre, who is, I think, a superintendent down at Strachan? A. Yes, I did.

"Q. What type of conversation was that? A. What prompted me to call Mr. Mohre?

"Q. What was the telephone conversation? A. Yes.

"Q. It was a telephone conversation? A. Yes.

"Q. How did you happen to call Mr. Mohre? Did you have any reason to call him? A. Yes, sir.

"Q. About Ivy Boudreaux? A. Yes.

"Q. What precipitated the call? A. Prior to my calling Mr. Mohre, Mr. Boudreaux called me and asked me—

"(Mr. Liska) I object again to any conversation that took place in 1948.

"(Trial Examiner) Overruled.

"(The Witness) Mr. Boudreaux contacted me and said he had been denied the privilege of working on the docks and had I heard.

"Q. (By Mr. Kyle) Had you heard about it? A. Yes, sir. I told him, 'Yes, Al called me but I instructed the delegates not to knock him off unless his appeals had been heard.'

"Q. Around that time, had your delegates discussed Boudreaux with you? A. Yes, they had and I told them not to knock him off.

"Q. (By Mr. Kyle) Tell us what your reports were, if you had any reports?

"(Trial Examiner Leff) I don't know what the reports were.

that anything that happened before June 21, 1949, did not come within the period involved in the complaint. However, from the latter portion of the quotation of Dennis' testimony it appears quite clearly that Chittenden's activities extended well within the six months period preceding December 19th, 1949.

"Q. (By Mr. Kyle) Did you have any reports from the delegates? A. Yes, I did.

"Q. Concerning Boudreaux? A. Yes.

"Q. And, you have testified of your telephone call with Mr. Chittenden and Mr. Boudreaux, and in your conversation with Mr. Boudreaux, then, did you call Mr. Mohre? A. Yes, I did.

"Q. About when was the telephone call with Mr. Mohre? A. The conversation was sometime in June because I remember well, I was preparing to go on my vacation and I told Boudreaux I would have to attend to it either that day or the next day because I was going to Hot Spring; prior to June 17, 1948.

"Q. You called Mr. Mohre? A. Yes, I did.

"Q. Tell us what the conversation was? A. After Boudreaux talked with me and said—

\*      \*      \*      \*      \*

"Q. (By Mr. Kyle) Did you talk to Mr. Mohre? A. Yes.

\*      \*      \*      \*      \*

"Q. (By Mr. Kyle) Did you place the call? A. To Mr. Mohre?

"Q. That is right? A. Yes, I did.

"Q. Have you talked to him from time to time on the telephone? A. Had I?

"Q. Yes? A. About this case?

"Q. About any matter? A. Yes, sir.

"(Trial Examiner Leff) Did you recognize his voice?

"(The Witness) Yes, certainly.

"(Trial Examiner Leff) Go ahead.

\*      \*      \*      \*      \*

"Q. (By Mr. Kyle) Tell us what you told Mr. Mohre and what he said? A. I called Mr. Mohre and told him what Boudreaux said to me.

"Q. What did you tell him Mr. Boudreaux told you? A. I understood from Mr. Boudreaux that he had been instructed by Al, not to let him work and I said, 'I want to let you know that 1419 has no part of not letting Boudreaux work until such time as all of his appeals have been heard.' I said, 'I think that insofar as my delegates are concerned, I instructed them not to knock him off.'

"Q. What do you mean 'knock him off'? A. Anybody working under our contract. We use the words 'knock off' when we mean not let them work under our contract, and I went on to tell Mr. Mohre what I had instructed my delegates and he said, 'I will tell you, Dennis, I am caught in the middle'.

"(Mr. Liska) I object to that conversation as being hearsay.

"(Trial Examiner Leff) Let him finish.

"(The Witness) Mr. Mohre said, 'I am caught in the middle.' I said 'I don't want my ships knocked off.' I said, 'Did Al tell you not to give Boudreaux a job?' He said, 'I don't want my ships knocked off.' I said, 'Am I to assume Al told you not to give Boudreaux a job?' He said, 'I don't want to get into union activities and I am not saying any more.'

\*      \*      \*      \*      \*

"Q. Now, as president of Local 1419, do you participate in the bargaining with the Steamship Association? A. Yes, I do.

"Q. What type of bargaining goes on with the Association? What is it for? A. For the purpose of negotiating a contract for the two unions.

"Q. Who is present at the meetings? A. The two presidents, along with a committee.

"Q. Of 1418 and 1419? A. Yes, sir.

"Q. Who represents the various stevedore companies? A. A labor committee of about six or eight men.

"Q. Do you know whether or not Mr. Moss participates in those hearings? A. Yes.

"Q. Do you know who Mr. Ralph Moss is? A. One of the top men of Lykes Brothers Company.

"Q. Is that the company operating Southern Stevedoring Company? A. Yes.

"Q. Did you attend all of those meetings during the year 1948? A. I did.

"Q. When did you usually start negotiating—strike that. When did you start negotiating in 1948? A. Sometime in August.

\*      \*      \*      \*      \*

"Q. (By Mr. Kyle) *Can you tell us just what you heard? How the statement or conversation came about?* A. *Al came in that morning—*

"Q. *Al who?* A. *Chittenden. He said to us, after we got around the table, chewing the rag, so to speak. He said to them, 'You know Boudreaux is not a member of the organization any more?' He said, 'Some of you are employing him and I am going to come out and knock him off one morning.' He means stop the ship from working is what we mean and he said, 'You got that troublemaker Boudreaux there again and the first time*

■■ Exact rules of evidence applied in court trials do not have to be followed in hearings before a trial examiner, and it is sufficient if, from the whole case, there is substantial proof of the charges made in a proceeding of this kind. We find it unnecessary to indulge in an extended discussion of the delicate situation involved in a controversy of this kind, where the president of a local union is engaged in a feud with one of its members. There is naturally an unwillingness on the part of the stevedore companies to get mixed up in such matters and the ship owners are also very reluctant to do anything that might cause them trouble in their business, such as Chittenden could give them, Stevedore employees are equally averse to being drawn into opposition to one exercising power such as Chittenden wielded in this case.

■ Without further discussion, it is sufficient to say that there is ample proof in this record to support the Board's finding both as to fact and law, and its order will accordingly be

Enforced.

*I come on the ship and find him, I will stop the ship from working.' That was in my presence.*

"Q. *You were sitting there* A. Yes.
"Q. *Were the company officials there?* A. Yes.

"Q. *Was there any comment or any conversation over that?* A. *No comment.*

"Q. *Did the company officials have anything to say?* A. *They said, 'You fellows shouldn't get us tangled into your union affairs. You should settle it and don't let us suffer, because we are innocent parties.'* (Emphasis by the writer.)
\*    \*    \*    \*    \*

"Q. (By Mr. Kyle) Was anything further said on that subject? A. No.

"Q. You know, Mr. Reed, connected with the Southern Stevedoring Company? A. Yes, I do.

"Q. Do you know what his position is down there? A. I think wharf superintendent.

"Q. Now, did you ever have an occasion to go down to a ship at Braithwaite to handle some sort of a dispute involving the company and the longshoremen? A. I did, yes.

"Q. Do you remember just when it was that you went down to Braithwaite on that particular matter? A. That was either the latter part of July or the middle of August.

"Q. Do you remember what the dispute was about? A. It was very hot, as I recall, and the men had been complaining the day before about not having enough men to work and we went to see about increasing the manpower in the gang.

"Q. August of what year? A. 1948.
"Q. *What year?* A. *1948. Rather, 1949.*
"Q. *1949?* A. *Yes.*
"(Trial Examiner Leff) *What month?*
"(The Witness) *It was either the latter part of July or the middle of August.*
"Q. (By Mr. Kyle) *Of 1949?* A. *Yes.*
"Q. *You said 1948 at first, the first time you answered the question. Are you prepared to state whether or not it was 1948 or 1949?* A. *It was 1948 during the time we were negotiating, I think, the same time we negotiated our contract.*
"Q. *This contract you just mentioned or the next year's contract?* A. *The next year's contract.*
"Q. *In 1949?* A. *It was 1949.*" (R. 84–89) (Emphasis by the writer.)