**SARDIS LUGGAGE COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 15905.

United States Court of Appeals
Fifth Circuit.

June 5, 1956.

Samuel Lang, Sumter D. Marks, Jr., New Orleans, La., for petitioner.

David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Rosanna A. Blake, Atty., Washington, D. C., Theophil C. Kammholz, General Counsel, Samuel M. Singer, Atty., National Labor Relations Board, Washington, D. C., for respondent.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is a petition by the company to set aside in part an N.L.R.B. order directing it to cease and desist from certain unfair labor practices and to reinstate four employees found to have been discharged or not recalled to work because of their union activities. The company does not oppose the requirement in the order that it cease and desist from interrogating and threatening its employees. However, it asserts that the direction that it reinstate the four employees in question should be set aside because of the Trial Examiner's bias in conducting the hearing and weighing the evidence, and lack of support for his findings of discrimination on the record considered as a whole. In its answer, the N.L.R.B. prays enforcement of the entire order.

The charge of bias in the conduct of the hearing is supported by reference to certain limitations placed upon petitioner's counsel in his cross-examination of witnesses, use of inadmissible evidence offered by the Board's counsel, and limitations placed on the Board's counsel during the direct examination of a witness, when the witness began giving testimony favorable to the petitioner. Thus, at one point the Trial Examiner refused to allow the use of a leading question on cross-examination, and at another time he so limited cross-examination of a witness as to forbid it altogether, practically speaking. He halted the examination of another witness, by the Board's counsel, with the comment, "I don't care to hear any more." Finally, he admitted the conclusory and hearsay statement by a witness that an employee involved here had been fired instead of his having quit, as is contended, and used it as a basis for a finding that in fact the employee was fired.

The Act requires that the rules of evidence be followed in Board hearings only "so far as practicable". 29 U.S.C.A. § 160(b). Therefore, departure from the rules of evidence is not erroneous in itself, and without more appearing, is no proof of bias on the part of the hearing officer. N.L.R.B. v. Local Union 1418, 5 Cir., 212 F.2d 846, 46 A.L.R.2d 1118; N.L.R.B. v. East Texas Steel Castings Co., 5 Cir., 211 F.2d 813. In order for such an allegation to be sustained

"It must appear * * * that the proceedings were characterized by fell expedition or determined purpose to reach a predetermined end, or were attended with suppressive and exclusionary rulings and actions, designed to prevent and preventing a fair hearing." Continental Box Co. v. N.L.R.B., 5 Cir., 113 F.2d 93, 96.

A reading of the record shows that this was not the case here. The Trial Examiner, in forbidding the use of a leading question on cross-examination "at this point," was only following the practice, which he regularly adhered to, of allowing the witness to give his testimony regarding an occurrence for the first time with as little interruption as possible, before subjecting him to questions, either on direct or cross-examination.[1] Thereafter, the use of leading questions on cross-examination was allowed, and the question here excluded was later asked by petitioner's counsel and answered by the witness.

The cross-examination of Richard K. Holder was severely limited when, after having been put on the stand by the Board, he was able to remember little of relevance to the case.

---

1. During the direct examination of Ruth Martin, a Board witness, he interrupted the Board's counsel to invite the witness to testify regarding an interview, with the remark, "Let the witness tell the story." Tr. 571. During the direct examination of Richard Grant, a witness for the petitioner, he interrupted the petitioner's counsel to request the witness to "Tell us the whole conversation in your own words."

On cross-examination, petitioner's counsel attempted to develop evidence favorable to the company on the issue of surveillance, which was later resolved by the Trial Examiner in the company's favor. The Trial Examiner ruled that since the direct examination revealed nothing pertinent to the case, the petitioner would have to adopt the witness as its own in order to elicit the testimony sought. The petitioner points out that thereafter, the Trial Examiner cited Holder's testimony in the Intermediate Report, an apparent inconsistency with the previous ruling that it was irrelevant. However, the citation was only a passing reference in footnote, having little, if any, bearing on the issues under consideration here.

We cannot discern in what respect the petitioner suffered any real prejudice because of this ruling, or by the limitations placed on the Board's counsel in his examination of Victor Tidwell. Either of the witnesses might have been called by the petitioner in its defense; therefore, it cannot be argued that any important body of evidence was excluded. Moreover, the suggestion that the rulings demonstrate bias, if they did not result in prejudice, asks us to probe too far, we think, into the subjective intentions of the hearing officer. Finally, the use of the single conclusory statement, "Jack * * * was fired," in support of a finding of fact, does not indicate, any more than do the above grievances, a "determined purpose to reach a predetermined end."

██ The same is true of the Trial Examiner's findings of credibility. The petitioner states that while the evidence of bias at the hearing created only a suspicion of partiality, it was "fully revealed" when the Intermediate Report appeared. The revelation, however, was largely in the fact that all important issues of credibility had been resolved in the Board's favor. It has consistently been held that this is no proof of bias, unless the credited evidence is inherently unworthy of belief or the discredited evidence irrefutably true. N.L.R.B. v.

Pittsburgh Steamship Co., 337 U.S. 656, 69 S.Ct. 1283, 93 L.Ed. 1602; Lloyd A. Fry Roofing Co. v. N.L.R.B., 1 Cir., 222 F.2d 938; Coca-Cola Bottling Co. v. N.L.R.B., 8 Cir., 195 F.2d 955; N.L.R.B. v. Houston & North Texas Motor Freight Lines, 5 Cir., 193 F.2d 394; N.L.R.B. v. Robbins Tire & Rubber Co., 5 Cir., 161 F.2d 798. As will be observed from the discussion of the evidence which follows, none of the rejected evidence had this quality of inherent veracity and none of the credited evidence carried the mark of obvious falsehood.

The unfair labor practices found to have been committed began a few months after the petitioner, a manufacturer of low-priced luggage, opened a new plant in Sardis, Mississippi. Production started on May 11, 1953, and by August, organizational activities by the United Furniture Workers, CIO, were underway. There is evidence that shortly thereafter the company, through its foremen, its plant superintendent, and even its president, began a campaign of consistent interrogation of employees regarding their sympathies and activities in connection with the union movement. This was accompanied by threats to close the plant if it was organized, and to discover which employees favored unionism and to "get them all" or "make it hard" on them. The petitioner, while not conceding that these unfair labor practices were committed, admits that there is substantial evidence in the record to sustain the Board's findings that the company's agents in fact engaged in all of these prohibited activities. It asserts, however, that there is a lack of substantial evidence to support the findings that it also discharged three employees and failed to recall another, because of their prominence in the union movement.

The petitioner contends that two of the alleged victims Mr. and Mrs. James Childress, were never discharged at all, but in fact quit. This is vigorously denied by both employees, and their testimony regarding the circumstances of their termination is irreconcilably con-

flicting with that of the petitioner's plant superintendent, Richard Grant.

James Childress's termination followed a dispute over the amount of work he was to perform. His job was sandpapering glue spots off the wooden frames of the luggage. The frames came off the assembly line faster than he could sandpaper them, and he invariably needed help on the job during part of the day. On the day in question, he was told that he would have to finish an accumulation of frames by noon, or be discharged. He failed to complete the job.

The plant superintendent testified that promptly at noon, Childress came to his office and said that he was quitting because he was unable to keep up with the work and because both he and his wife were unhappy at the plant. He added that he thought that they both should quit. Thereupon Grant paid him off and he left.

Childress testified that he ate lunch at the plant, and after the bell rang to resume work, he met Grant in the plant and asked him, "What about it?" Grant checked the counter indicating the number of boxes produced, and told him that he was fired. Childress challenged him on the real reason for his discharge, stating, "It is bound to be those cards that has been circulating around here." Grant answered, "That's it," and the two went into Grant's office, where they talked further about the union, after which Childress was discharged and paid off.

Ethel Childress's termination is likewise the subject of conflicting testimony. Grant testified that after James Childress had told him that neither he nor his wife were happy at the plant, and that probably they both should quit, he called her into his office to see if he could count on her for the next workday. She informed him that she too, was quitting, and she was paid off.

Mrs. Childress testified that when she was called into Grant's office, her pay was in plain view on his desk. Grant said that since she had stated that she would not work for 75 cents an hour, and her earnings had not increased beyond that point, he was taking her at her word and letting her go. Mrs. Childress answered that she had agreed to try the job for three weeks, but Grant replied that "We have tried you and you are not doing your work." Mrs. Childress disputed this statement, and after more conversation about her work, Grant ended the interview by saying, "I was told to let you go. I am discharging you now."

Both of these cases involve questions of credibility, which the Trial Examiner resolved against Grant. Where such conflicts in testimony appear, the judgment of the fact-finder is rarely subject to reversal. Precision Fabricators v. N.L.R.B., 2 Cir., 204 F.2d 567; N.L.R.B. v. Dinion Coil Co., 2 Cir., 201 F.2d 484. See also Universal Camera Corp. v. N.L.R.B., 340 U. S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456. Particularly where there is corroboration for the credited witnesses' testimony, as is the case here,[2] the credited version will be accepted on appeal. Moreover, the finding that the true reason for the discharges was the Childresses' union activity is amply supported in the record.

The Trial Examiner also found that Louise Durham was discharged and Glover Jackson not recalled after an economic layoff, because of their union activities. Mrs. Durham was discharged on October 13, 1953, almost two months after the Childresses were discharged, and at a time when the union movement was quite dormant. The assigned reason for her discharge was unsatisfactory work, which later in the same week oc-

---

2. Willard Bratton testified that Grant told him that "[W]e fired Jack [Childress] because he couldn't make production." Tr. 317. Earline Henson testified that before Ethel Childress was called into Grant's office on the day she left the company, she said, "Well, I am not going to quit. I just won't quit. They will just have to fire me first."

casioned the discharge of two other employees in the sewing department.

It is undisputed that at the time the company was receiving complaints from customers regarding the quality of its products. A letter from Sears, Roebuck and Co., the largest customer, stated that "the overall workmanship from the Sewing Department must be improved in order to maintain our reputation for quality with our stores." Mrs. Durham was employed at several operations in this department, and consistently fell below her work quota at all of them. The Trial Examiner found, however, that these frequent job transfers were intended to prevent her from attaining her production quota, and that the delay in discharging her was calculated to give the false appearance of a discharge for cause. The real reasons for her release, according to the findings, were her union sentiments, her "ominous friendship" with the Childresses, and her willingness to talk to N.L.R.B. investigators.

With due respect for the Trial Examiner's opportunity to observe the demeanor of the witnesses, we think these inferences strained and unsubstantiated on the record considered as a whole. The company's concern over the quality of work coming from its sewing department was indisputably serious. Mrs. Durham's discharge was not the only measure taken by the company to correct these failings. On the other hand, her union activity was relatively minor, consisting only of her own membership and advising four fellow employees that they could get union cards from Mrs. Childress. The finding that the company moved her from job to job and delayed her discharge for nearly two months in order to disguise its real motives attributes to it a subtlety in evading the Act in great contrast to its otherwise blunt methods. Moreover, the finding is made even more tenuous by the fact that the alleged stratagems were used to remove a relatively minor union figure, while the real leaders, the Childresses, were discharged quite summarily.

The same conclusion must be reached regarding the company's failure to recall Glover Jackson, whom the Trial Examiner found was laid off for economic reasons but not recalled because of his prior union activities. The failure to recall him was in March, 1954, seven months after the Childresses were discharged. The company offered evidence that he was quite old, having previously falsified his age on the employment form, and was a poor compensation risk. There was a conflict in the evidence over the quality of his work. He testified that he had been praised for his work, while the plant superintendent denied this, and his foreman asserted that "on many occasions" Jackson had been reprimanded for his work. On account of his age, he had also requested to be excused from unloading boxes, which was a task shared by all of the employees in his department. The Trial Examiner rejected this evidence and found that the true reason for the company's not recalling him was his union affiliation and activities. The time interval was explained as "a contrived plan or tactical maneuver designed to screen Respondent's true motive."

The Trial Examiner indicated that his finding of a discriminatory reason for Jackson's not being recalled was based in large degree on the fact that the company's assigned reasons were unconvincing. Therefore, he concluded, Jackson was not recalled because his was one of "four strategically timed discharges" calculated "to defeat the incipient organizational campaign."

However, the company's reasons for not recalling Jackson were certainly sufficient in themselves, and the assigned motive has little support in the record, for the company's anti-union campaign appears to have diminished as soon as union activity waned, and the latter does not appear to have carried very far after August, 1953. During the campaign and particularly throughout its stage of aggressive anti-unionism, the company's actions toward union adherents should be scrutinized with great

care. Smith Transfer Co. v. N.L.R.B., 5 Cir., 204 F.2d 738. However, this cannot be extended so far as to support an inference of a long-continuing plan of revenge or systematic removal, where no other facts point to such a conclusion and credible nondiscriminatory grounds for managerial decisions exist.

We think that the latter was the case with Louise Durham and Glover Jackson. Therefore, the petition to set aside the Board's order will be granted as to these employees, but denied in all other respects. As thus modified the Board's order will be enforced.

Modified and enforced.