**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CAPITOL FISH COMPANY, Respondent.**

No. 18404.

United States Court of Appeals
Fifth Circuit.

Sept. 27, 1961.

ners *A* and *C* are capital assets, or vice versa?

14. See note 10, supra.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Dominick L. Manoli, Assoc. Gen. Counsel, N.L.R.B., Washington, D. C., Charles M. Paschal, Jr., Reg. Atty., N.L.R.B., New Orleans, La., Stuart Rothman, Gen. Counsel, Allison W. Brown, Jr., James A. Ryan, Attorneys, National Labor Relations Board, Washington, D. C., for petitioner.

C. E. Gregory, Jr., H. Fred Gober, Atlanta, Ga., Arnall, Golden & Gregory, Atlanta, Ga., for respondent.

Before RIVES and WISDOM, Circuit Judges, and DAWKINS, Jr., District Judge.

WISDOM, Circuit Judge.

The National Labor Relations Board petitions this court for enforcement of its order of May 7, 1960, against respondent, Capitol Fish Company. The order rests on two findings: first, that Capitol Fish violated Section 8(a)(1) of the National Labor Relations Act by interfering with its employees in the exercise of their rights under Section 7 of the Act; second, that Capitol Fish violated Section 8(a)(3) and 8(a)(1) by discriminatorily discharging an employee, Bennie Hill, because of his union activities. 126 N.L.R.B. No. 123. The testimony, as usual in an unfair labor practice case, is conflicting. The respondent contends that the findings are not supported by substantial evidence, a contention we do not reach.

The distinguishing feature of this case is the respondent's contention that in violation of the due process clause of the Fifth Amendment, it was denied the right to introduce material evidence. This is based (1) on the General Counsel's refusing to permit the attorney who investigated the case and prepared it for trial to testify and (2) on the trial examiner's quashing a subpoena issued to the attorney. The respondent contends that the attorney's testimony would have shown that he carried partiality to Hill, the charging party, beyond proper limits, indeed, to the point of attempting to persuade prospective witnesses to twist the facts in order "to help Bennie" and Bennie's family. These improper activities affect the entire case, so the respondent argues, because they cast a doubt on the credibility of all the witnesses against respondent. The Board brushes off the contention, in a footnote in its brief, as the injection of a collateral issue designed to reflect on the Board's investigatory procedures; if upheld, says the Board, it would impair the functioning of the investigatory powers of the Board. We consider the contention serious and basically sound. We find it unnecessary, however, to reach the constitutional issue; exclusion of the investigating attorney as a witness violated the

statutory provisions governing proceedings under the Act.

## I

Capitol Fish is engaged in the sale and distribution of frozen and canned sea foods in Atlanta, Georgia. In September 1958, Local 315, Retail, Wholesale and Department Store Union AFL–CIO, requested respondent to recognize it as the collective bargaining representative for respondent's production, maintenance, and warehouse employees, including truck drivers. The union petitioned the Board for an election. Several weeks later, after a local unit of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America also petitioned the Board for an election, the Retail Union withdrew its petition in favor of the Teamsters Union. The election was by consent. October 13, 1958, the Board certified that the union had not received a majority of the votes cast and was not the exclusive representative of respondent's employees. The union did not contest the election nor contend that the company committed any unfair labor practices in connection with the election.

January 5, 1959 Capitol Fish discharged Bennie Hill, one of its truck drivers, telling him that business was slow and it was necessary for the company to discharge some employees in order to reduce costs. The Board found that the company discharged Hill because it "ascertained that Hill was a leader in the organizing campaign"; the Company denies that there is any evidence that the Company knew of such activities.

January 12, 1959, Hill filed a charge against Capitol Fish, alleging that he had been discriminated against, and that by this and other acts Capitol Fish "interfered with, restrained and coerced its employees in the exercise of their rights as guaranteed in Section 7 of the Act." February 4, 1959, Porter Baldwin, another discharged employee, filed a similar charge. The examiner found, and the Board approved, that a discriminatory discharge of Baldwin was not shown by a preponderance of the evidence. The union filed no charges whatever.

Some time before the hearing, Capitol Fish requested the Regional Director to issue a subpoena to the Board's investigating attorney and to secure the General Counsel's permission for the attorney to testify. The Director issued the subpoena but informed the respondent that it would have to ask permission itself. Capitol Fish, in writing, asked the General Counsel for permission to have the attorney testify. The respondent pointed out that it had two affidavits showing that the attorney, accompanied by Bennie Hill, the complaining witness, approached employees and sought to obtain statements from them favorable to Hill by appeals to their sympathy for Hill and his family. The General Counsel denied permission, relying on N.L.R.B. Regulations, 29 C.F.R. Section 102.118. This section prohibits Board employees from producing files or records or testifying in regard thereto without permission of the Board or General Counsel.[1]

1. Section 102.118. "No regional director, field examiner, trial examiner, attorney, specially designated agent, general counsel, member of the Board, or other officers or employee of the Board shall produce or present any files, documents, reports, memoranda, or records of the Board or testify in behalf of any party to any cause pending in any court or before the Board, or any other board, commission, or other administrative agency of the United States or of any State, Territory, or the District of Columbia with respect to any information, facts, or oth-

er matter coming to his knowledge in his official capacity or with respect to the contents of any files, documents, reports, memoranda, or records of the Board, whether in answer to a subpena, subpena duces tecum, or otherwise, without the written consent of the Board or the chairman of the Board if the official or document is subject to the supervision or control of the Board; or the general counsel if the official or document is subject to the supervision or control of the general counsel. Whenever any subpena ad testificandum or subpena duces tecum,

At the outset of the hearing, the respondent moved that the hearing be postponed "until such time as the General Counsel grants permission for Mr. Miller to testify." The trial examiner denied the motion, on the ground that the General Counsel had already denied the request. The investigating attorney was present and represented the General Counsel at the hearing. Another Board attorney moved to quash the subpoena on the grounds that "the permission to testify has been denied and the matter is irrelevant anyway." The trial examiner granted the motion and revoked the subpoena.

The unrebutted testimony of Robert Poole, who voluntarily left Capitol Fish for a better paying job, supports the respondent's contention that the investigating attorney's testimony would have an important bearing on the credibility of all the witnesses who testified against Capitol Fish. Poole said that the attorney, on one occasion accompanied by Hill, approached him and others several times for a written statement, "to help Bennie." In response to questions intended to serve as the basis for a written statement, Poole denied that he had "heard Mr. Julius and Mr. Jacob Levitt [of Capitol Fish] * * * talk against the union." Notwithstanding these denials, the attorney persisted in asking Poole "to help Bennie." "He was saying to me about this man being out of work and had a family, and I told him I had a family myself and I didn't see any reason why—there was nothing I could do to get involved in helping Bennie." After Poole left the respondent's employ, the

attorney telephoned Poole's home several times. Finally, he called at Poole's home and again asked for a statement. "He handed me a paper [8" x 11"] with [just my] name and address on it, as much as I can see, and told me to sign it and I told him I wasn't gonna sign anything." During the course of the trial, one of the General Counsel's witnesses testified that he was "positive" that Jacob Levitt had no conversation with him about who were the union leaders. He had to be shown his pre-trial affidavit before he could remember that he had made the written statement that Levitt had discussed the subject of union leaders with him and had attempted to find out their names. Another witness, who could read only "a little bit," had to have the investigating attorney, in his capacity as trial attorney, read the witness's pretrial statement to him before he could recall what Mr. Julius Levitt had said about the unions; even then he testified that he was "not sure."

The inference that the investigating attorney, playing on the sympathy of employees for their fellow employee and his family, attempted and, in part, succeeded in obtaining from prospective witnesses false or twisted statements may be a cruel injustice to him. But it is a reasonable inference for the respondent to draw, it is material, and fair trial procedures shaped by centuries entitle respondent to an opportunity to support the inference by the attorney's own testimony—unless valid regulations of the N.L.R.B. justify the trial examiner's ruling affirmed by the Board.

the purpose of which is to adduce testimony or require the production of records as described hereinabove, shall have been served upon any such persons or other officer or employee of the Board, he will, unless otherwise expressly directed by the Board or the chairman of the Board or the general counsel, as the case may be, moved pursuant to the applicable procedure, whether by petition to revoke, motion to quash, or otherwise, to have such subpena invalidated on the ground that the evidence sought is privileged against disclosure by this rule: *Provided,*

After a witness called by the general counsel has testified in a hearing upon a complaint under section 10(c) of the act, the respondent may move for the production of any statement of such witness in possession of the general counsel, if such statement has been reduced to writing and signed or otherwise approved or adopted by the witness. Such motion shall be granted by the trial examiner. If the general counsel declines to furnish the statement, the testimony of the witness shall be stricken."

## II

As enacted originally, Section 10(b) of the National Labor Relations Act provided that "the rules of evidence prevailing in courts of law or equity shall not be controlling" in proceedings before a trial examiner. This broad grant of discretion and the lack of judicial control over evidence rulings of trial examiners and the Board, led Congress to amend the statute in 1947 so as to require the Board to follow the rules of evidence prevailing in federal courts.[2] Section 10(b) of the Act now provides: "Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States pursuant to section 2072 of Title 28."

The peculiar characteristics of administrative hearings justify certain departures from district court rules. For example, the rules against hearsay evidence are considerably relaxed in such hearings, on the theory that the ex-aminer is more sophisticated than a juror and will not attach improper weight to such testimony.[3] Here, the ruling concerned the exclusion of testimony. In the district courts improper exclusion of evidence, if prejudicial, will cause a reversal of the judgment. Cervin v. W. T. Grant Co., 5 Cir., 1938, 100 F.2d 153. No special characteristics of an administrative hearing justify the exclusion of evidence which it would be error to exclude in a court trial, and in several cases N.L.R.B. orders have been reversed for the wrongful exclusion of evidence.[4]

## III

The trial examiner explicitly based the exclusion of the investigating attorney's testimony on an N.L.R.B. regulation prohibiting Board employees from producing reports or records of the Board for use as evidence or personally testifying in any cause before a court or the Board without the written consent of the Board or the General Counsel.[5] This regulation was issued under 5 U.S.C.A. § 22, authorizing the head of each department to prescribe regulations for the "custody, use, and preservation of the records, papers and property" of his department.[6]

---

2. "Thus the act gives the Board great latitude in choosing the evidence that it will believe and gives great effect to findings that rest on that evidence * * *. These clauses of the act have resulted in what the courts have described as 'shocking injustices' in the Board's rulings * * *. The bill does this, by providing in section 10(b) of the amended Labor Act that 'so far as practicable,' the new Board's proceedings shall be conducted 'in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure.' There is no such diversity in the rules of evidence among the several States as to make this clause unduly burdensome to the Board or to its trial examiners. Local lawyers and the Administrator's regional attorneys appearing before the trial examiners can always advise them of oddities in local laws. And, in any event, an error in admitting or excluding evidence can be grounds for reversal only if it is substantial." H.R.Rep. No. 245, 80th Cong., 1st Sess. 41 (1947).

3. N. L. R. B. v. W. B. Jones Lumber Co., 9 Cir., 1957, 245 F.2d 388; see also Sardis Luggage Company v. N. L. R. B., 5 Cir., 1956, 234 F.2d 190.

4. N. L. R. B. v. Adhesive Products Corp., 2 Cir., 1958, 258 F.2d 403; N. L. R. B. v. Tennessee-Carolina Transportation, Inc., 6 Cir., 1955, 226 F.2d 743; N. L. R. B. v. Burns, 8 Cir., 1953, 207 F.2d 434.

5. See footnote 1.

6. 5 U.S.C.A. § 22 reads as follows: "The head of each department is authorized to prescribe regulations, not inconsistent with law, for the government of his department, the conduct of its officers and clerks, the distribution and performance of its business, and the custody, use, and preservation of the records, papers, and property appertaining to it. This section does not authorize withholding information from the public or limiting the availability of records to the public." For the general problem involved here see: Asbill and Snell, Scope of Discovery Against the United States, 7 Vand.L.

On the surface at least there is uncertainty as to the effect of such regulations. Several cases uphold the validity of similar regulations and the refusal of a subordinate official to produce evidence, even under a court subpoena, when forbidden to do so by such a regulation. The leading case is United States ex rel. Touhy v. Ragen, 1951, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417. The petitioner in a habeas corpus proceeding demanded that a subordinate official in the Federal Bureau of Investigation produce certain records pertinent to his case. The official refused, relying on a regulation requiring the consent of the Attorney General before such records could be furnished. The Supreme Court held that the refusal of the official was proper and that the Attorney General may withdraw from his subordinates the power to release department papers.[7]

Cases upholding such regulations do not purport to grant an absolute freedom to the executive to prevent use of department papers as evidence. Validation of the regulations rests directly on the theory that as a matter of internal management the head of an agency is authorized to reserve to himself the authority to release the records.[8] The opinion in the Ragen case carefully avoided the question of the power of the agency head to refuse a proper judicial demand for the production of the records.[9] Justice Frankfurter's concurring opinion emphasized the narrow basis of the holding: the regulation was upheld only as a requirement that demands to obtain department papers must be made upon the Attorney General. He declared that upon such a demand the Attorney General could refuse to produce the papers only if they were subject to a valid privilege and that the regulations could not be used as an escape from the court's jurisdiction to avoid an obligation to produce the evidence.[10]

Rev. 582 (1954); Berger and Krash, Government Immunity from Discovery, 59 Yale L.J. 1451 (1950); Bishop, the Executive's Right of Privacy; An Unresolved Constitutional Question, 66 Yale L.J. 477 (1957); Mitchell, Government Secrecy in Theory and Practice: "Rules and Regulations" as an Autonomous Screen, 58 Colum.L.Rev. 199 (1958); Remedies Against the United States, 70 Harv.L.Rev. 827, 934–938 (1957). For excellent coverage of relevant cases see 8 Wigmore, Evidence §§ 2378–2379 (McNaughton rev. 1961).

7. In Boske v. Comingore, 1900, 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846, the Supreme Court overturned a contempt citation against a local collector of Internal Revenue who refused to obey a subpoena ordering him to produce certain official records where a regulation prohibited release of such records without the approval of the Secretary of the Treasury. Ex Parte Sackett, 9 Cir., 1935, 74 F.2d 922.

8. In Ragen the Court stated: "When one considers the variety of information contained in the files of any government department and the possibilities of harm from unrestricted disclosure in court, the usefulness, indeed the necessity, of centralizing determination as to whether subpoenas duces tecum will be willingly obeyed or challenged is obvious. Hence, it was appropriate for the Attorney General, pursuant to the authority given him by * * * 5 U.S.C.A. § 22, to prescribe regulations not inconsistent with law for 'the custody, use, and preservation of the records, papers, and property appertaining to' the Department of Justice, to promulgate Order 3229." 340 U.S. at page 468, 71 S.Ct. at page 419.

9. The Court said, "We find it unnecessary, however, to consider the ultimate reach of the authority of the Attorney General to refuse to produce at a court's order the government papers in his possession, for the case as we understand it raises no question as to the power of the Attorney General himself to make such a refusal." 340 U.S. at page 467, 71 S.Ct. at page 419.

10. Justice Frankfurter stated: "In joining the Court's opinion I assume * * * that the Attorney General can be reached by legal process. Though he may be so reached, what disclosures he may be compelled to make is another matter. It will of course be open to him to raise those issues of privilege from testimonial compulsion which the Court rightly holds are not before us now. But unless the Attorney General's amenability to process is impliedly recognized we should candidly face the issue of the immunity pertaining to the information which is here sought. To hold now that the Attorney

■ In final analysis, justification for excluding government records rests on privilege. Courts have often recognized that government papers may be privileged because of their confidential nature.[11] In United States v. Reynolds, 1953, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727, the widows of three civilians killed in the crash of an Air Force bomber sought recovery under the Federal Tort Claims Act. They moved for the production of the Air Force's official accident investigation report. An Air Force Regulation, issued under 5 U.S.C.A. § 22, provided that special accident reports would not be made available to persons outside the chain of command without the specific approval of the Secretary of the Air Force. In a letter to the district court the Secretary stated, "it has been determined that it would not be in the public interest to furnish this report * * *" and thereafter he filed a formal "Claim of Privilege." On appeal the Supreme Court reversed a district court ruling requiring production of the evidence. In so doing, however, it made clear (1) that the basis for the reversal was its conclusion that the material was privileged and (2) that it was the function of the Court and not the Air Force to determine whether the privilege existed. "Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers," it stated. 345 U.S. at page 9, 73 S.Ct. at page 533.

Ragen may be read as precluding judicial determination of the non-existence of a privilege or its waiver when a regulation reserves to a department head authority to release official papers and the head has not been served by process. The Court of Appeals concluded that there was a privilege in the Department of Justice unless it had been waived, and found that there had been no waiver. 7 Cir., 180 F.2d 321. The Supreme Court did not reach this issue. It limited its examination "to what this record shows, to wit, a refusal by a subordinate of the Department of Justice to submit papers to the court in response to its subpoena *duces tecum* on the ground that the subordinate is prohibited from making such submission by his superior." 340 U.S. at 467, 71 S.Ct. at 419. The Court held that the subordinate's action was justified by the regulation irrespective of whether the records were privileged.

■ In Reynolds, however, where the Supreme Court did consider the substantive merits of the alleged privilege, the Secretary of the Air Force evidently had not been served by process.[12] Although the Reynolds decision, decided two years after Ragen, does not expressly conflict with the latter, it does seem to overrule the suggestion in Ragen that the lack of service of process over the departmental head prevents a court from deciding whether evidence withheld by a subordinate is privileged.[13] It might be ar-

General is empowered to forbid his subordinates, though within a court's jurisdiction, to produce documents and to hold later that the Attorney General himself cannot in any event be procedurally reached would be to apply a fox-hunting theory of justice that ought to make Bentham's skeleton rattle." 340 U.S. at 472–473, 71 S.Ct. at 421.

11. E. g., Totten v. United States, 1875, 92 U.S. 105, 23 L.Ed. 605; Zacher v. United States, 8 Cir., 1955, 227 F.2d 219, 226, certiorari denied, 1956, 350 U.S. 993, 76 S.Ct. 542, 100 L.Ed. 858.

12. The opinion of the Court of Appeals stated that the Secretary was "notified" by the Justice Department after the district judge ordered production of the rec-

ords. (D.C.E.D.Penn.1950, 10 F.R.D. 468). The Secretary then sent a letter to the district judge stating that it would not be in the public interest to furnish the report. At a special hearing in Washington, D. C. the Secretary filed a formal "Claim of Privilege" and an affidavit. This action was apparently taken on the Secretary's initiative, and there is no indication that the Secretary was served by process. 3 Cir., 192 F.2d 987, 990.

13. The two cases perhaps could be reconciled by restricting the holding in Ragen to cases where a subordinate has been held in contempt for refusal to obey a subpoena. Both Ragen and the Comingore case involved this factual setting.

gued that Reynolds is distinguishable since there the issue of privilege was raised directly by the claim of privilege filed by the Secretary of the Air Force. It seems to us, however, that when a party has filed a request for evidence or testimony and the request can be properly denied only if the evidence or testimony is privileged, the question of privilege is as squarely raised by an unexplained refusal to comply as by an express claim of privilege, and the court must decide the question.

An agency has a legitimate and tidy housekeeping objective in centralizing the determinations of when to assert and when not to assert a privilege. That objective is fulfilled when permission is requested from the head of the agency or other proper party. To require service of process on the N.L.R.B. would open the possibility that some litigants would be deprived of the use of material, unprivileged evidence; it would impose an additional and unnecessary burden on parties seeking to obtain government records; it would lay a trap for the unwary. It would do this without the slightest compensating improvement in the disposition of justice.

■ 5 U.S.C.A. § 22 cannot be construed to establish authority in the executive departments to determine whether certain papers and records are privileged. Its function is to furnish the departments with housekeeping authority. It cannot bar a judicial determination of the question of privilege or a demand for the production of evidence found not privileged. Had there been any doubt

of this before, the doubt was removed by the amendment of 5 U.S.C.A. § 22 in 1958 making explicit the fact that the section does not of itself create a privilege. This amendment added the sentence, "This section does not authorize withholding information from the public or limiting the availability of records to the public." 72 Stat. 547 (1958). As a matter of comity, courts frequently do not require disclosure of the evidence when the circumstances indicate that the records should be confidential; if the court wishes to scrutinize it to make sure, the evidence may be examined in camera. But the ultimate determination of the privilege remains with the courts.[14]

■ There is no suggestion in the record that the testimony sought to be elicited from the Board attorney is privileged. The testimony does not involve matters vital to national security, as in the Reynolds case, or information which should be kept secret for other reasons. It is not necessarily related to any physical records. The Board's General Counsel made no explanation and the trial examiner was satisfied with the bare fact that the agency head charged with knowing what is right and good for the public to know had made his decision. Fundamental fairness requires that Capitol Fish be allowed to introduce testimony that may impeach the evidence offered against it. The N.L.R.B. cannot hide behind a self-erected wall evidence adverse to its interests as a litigant. 5 U.S.C.A. § 22 does not call for a result so inimical to our traditions of a fair trial.[15]

Certainly the desire is strong to avoid punishing an official for obeying his departmental regulations even in disregard of a court order.

14. United States v. Reynolds, 1953, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727; Mitchell v. Bass, 8 Cir., 1958, 252 F.2d 513; Overby v. United States Fidelity & Guaranty Co., 5 Cir., 1955, 224 F.2d 158; Morris v. Atchison, Topeka & Santa Fe Ry. Co., D.C.Mo.1957, 21 F.R.D. 155; Zimmerman v. Poindexter, D.C.Hawaii 1947, 74 F.Supp. 933.

15. N. L. R. B. v. Adhesive Products Corp., 2 Cir., 1958, 258 F.2d 403; Mitchell v. Bass, 8 Cir., 1958, 252 F.2d 513; United States v. Certain Parcels of Land, D.C. S.D.Cal.1953, 15 F.R.D. 224, 230; Durkin v. Pet Milk Co., D.C.W.D.Ark.1953, 14 F.R.D. 385; See Bernstein v. United States, 10 Cir., 1958, 256 F.2d 697, 702–703. Cf. Greene v. McElroy, 1959, 360 U.S. 474, 496–497, 79 S.Ct. 1400, 1413–1414, 3 L.Ed.2d 1377, 1390–1391.

This case presents an anomaly in our system of justice. The agency official charged with responsibility for asserting the claim of privilege is also the prosecutor whose successful prosecution of this case could depend on exclusion of the evidence for which the privilege is claimed. And, he is one part, the trial court (examiner) a second part, and the reviewing court (the Board) a third part of one agency—the agency bringing the action.[16] Impartiality is the life of justice. It is against all concepts of impartial justice for the trial examiner to assume that the Board, through its regulations, or the General Counsel, by virtue of his office, is the final arbiter to decide whether a Board attorney should testify. Responsibility for deciding the question of privilege properly lies in an impartial independent judiciary— not in the party claiming the privilege and not in a party litigant.

The record indicates that the trial examiner did not consider whether the General Counsel was right or wrong in refusing to allow the investigating attorney to testify; the General Counsel denied permission, and that was enough for the examiner. We hold that the investigating attorney's testimony was material, was not privileged, and was erroneously excluded by the Trial Examiner.

The case is remanded for further proceedings not inconsistent with this opinion.

16. The Labor Management Relations Act of 1947 radically changed the internal organization of the National Labor Relations Board by separating the functions of the Board. One of the purposes was to avoid criticism that the Board was "acting as prosecutor, judge, and jury, and to all intents and purposes as its own Supreme Court insofar as findings of fact are concerned." H.R.Rep. No. 245 on H.R. 3020, 80th Cong., 1st Sess., 1947. To carry out this purpose the Act provided that the President shall appoint the General Counsel of the Board, and that he shall exercise general supervision over all attorneys employed by the Board (other than trial examiners and legal assistants to Board members) and over the regional offices. He has original authority over the investigation and prosecution of unfair labor practice cases. This is a praiseworthy attempt to isolate the prosecuting function from the adjudicatory function. To an extent, therefore, the Board's functions are divided; the trial examiners, for example, are not under the General Counsel's supervision. But this fractionation of functions is internal, and the General Counsel is still both prosecutor and attorney for the Board, a body in the nature of a court when it reviews the finds and recommendations of its trial examiners.