In re ROBINSON.

(Supreme Court, Appellate Division, First Department.   June 14, 1912.)

1. ATTORNEY AND CLIENT (§ 42*)—OFFICE OF ATTORNEY—OFFENSES.

That many claims against a street railway company were not only fraudulent, but were attempted to be sustained by fraudulent practices by those presenting them, does not justify an attorney of the company in approving disbursements involving bribery of witnesses and subornation of perjury.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 54; Dec. Dig. § 42.*]

2. ATTORNEY AND CLIENT (§ 42*)—OFFICE OF ATTORNEY—OFFENSES.

On charges of professional misconduct against an attorney in approving claims against a street railroad company for disbursements involving bribery of witnesses or subornation of perjury, he cannot justify himself by showing that he has escaped criminal responsibility.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 54; Dec. Dig. § 42.*]

3. ATTORNEY AND CLIENT (§ 42*)—OFFICE OF ATTORNEY—DUTIES AND LIABILITIES.

An attorney of a street railroad company cannot shut his eyes to a system maintained by his subordinates which tends to suborn witnesses, but he has an affirmative duty to protect the administration of justice from perjury and fraud.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 54; Dec. Dig. § 42.*]

4. ATTORNEY AND CLIENT (§ 42*)—OFFICE OF ATTORNEY—DUTIES AND LIABILITIES.

Where it appears on the face of vouchers presented to an attorney of a street railroad company that his subordinates have spent money to obstruct the administration of justice or to induce false testimony from perjured witnesses, it is his clear duty to do all that is possible to discourage such practices, and he cannot escape responsibility by claiming an excess of work when he deliberately approves the application of his client's money for such purposes.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 54; Dec. Dig. § 42.*]

5. ATTORNEY AND CLIENT (§ 42*)—DISBARMENT—GROUNDS.

Where an attorney of a street railroad company approves vouchers for disbursements by detectives and investigators for expenses with plaintiffs' witnesses, keeping them away from home, their hotel bills, meals, etc., payments to defendant's witnesses, payments to court officers, clerks, and attendants, and police officers, physicians, and hospital employés, and disbursements of large amount in particular cases for which no particular purpose is stated, these payments being made in such

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

numbers as to show a system deliberately conducing to bribery and subornation of perjury, the attorney will be disbarred.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 54; Dec. Dig. § 42.*]

Charges of professional misconduct by the Association of the Bar of the City of New York against Henry A. Robinson, an attorney. Respondent disbarred.

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

Tompkins McIlvaine, of New York City, for petitioner.

Edward W. Hatch, of New York City, for respondent.

INGRAHAM, P. J. The respondent is charged with misconduct in participating in and authorizing the payment of sums of money by the Metropolitan Street Railroad Company to employés who were called detectives or investigators in relation to litigation before the courts wherein the railroad company was defendant. The charges were referred to a referee, who, after a most careful and impartial investigation, has reported to the court that the charges were to a large extent sustained by the evidence, and the matter is now before us for final disposition.

The Metropolitan Street Railroad Company during the period covered by this investigation was operating a street railroad system over a large portion of the city of New York. The respondent was its general attorney, having specially in charge litigation arising out of the injuries caused to individuals by reason of the operation of its road. The litigation of this character had become very large, many persons having been injured in the course of the operation of the defendant's railroad system, resulting in a great number of claims being presented against the railroad company, many of which were followed by actions to recover damages for the injuries sustained. The railroad company maintained a large number of these so-called detectives or investigators, whose duty it was to investigate the accidents which resulted in personal injuries, and to secure the names of witnesses who could testify or assist the respondent and the other attorneys employed by the company in the defense of these actions. The disbursements of these investigators or detectives were paid by vouchers presented by them and which had been approved by the respondent as the general attorney for the company. These charges are based upon vouchers that were approved by the respondent and paid by the company. It appears that but a small proportion of the vouchers that were actually approved by the respondent have been procured and form the basis of these charges. Whether the other vouchers were of the same character as those that have been procured does not appear. I think it may fairly be said that the character of the payments made by these investigators or detectives in connection with the litigation against the said railroad company represented the general method adopted by those in charge of the litigation against the Metropolitan Street Railroad Company in meeting

and defeating the claims of those who had made claims against the railroad company to recover for injuries that had been sustained. In this case it is more the system adopted by the respondent as the general attorney for the railroad company, and the methods adopted in defeating litigants who had claims against his client that are before us for consideration, than the fact that any particular payment was made and approved.

[1] The Metropolitan Street Railroad Company had presented against it each year a very large number of claims for. compensation for personal injuries. It is undoubtedly true that the officials of that company were satisfied that a considerable portion of these claims were fraudulent and without merit, and undoubtedly the protection of the company required a thorough investigation of each claim as soon as notice of it was called to the attention of its officers. The legitimate expenses of such an investigation would undoubtedly be justified, and neither the general officers of the company nor the respondent, its attorney, could be criticised for doing their utmost to defeat fraudulent claims and prevent unfounded demands against the company being successfully prosecuted; but the necessities of the corporation could not justify an approval of the bribery of witnesses who could give testimony which would be material to the trial of the action, or of the payment of money to public officials who had connection with either the investigation of the validity of the claims or with the determination of the actions brought against the company by the claimants. It is suggested that many claims against this company were not only fraudulent, but were attempted to be sustained by fraudulent practices on the part of those presenting them, and that the respondent was justified in "fighting fire with fire." We cannot accept any such excuse for the reprehensible conduct of which he is accused, and has been found guilty. These charges relate to the action of the respondent, an attorney at law and an officer charged by the state to assist in the disposition of the legal business of his client. Over the officers of the railroad company or its investigators or detectives we have in this proceeding no jurisdiction. What is charged here is that this respondent who had assumed the responsibilities of an attorney at law, has by his action approved and justified the payment of large sums of money by his client for purposes which tended to impede and obstruct the administration of justice and which were made for that purpose. Every one who has had to do with the litigation in actions to recover for personal injuries is constantly impressed with the perjury and fraud that are connected with these cases. Case after case arises in which the testimony is based, not upon the actual recollection of the witnesses, but upon what seems to be necessary to secure the success of the party in whose behalf the witness has been called to testify. So far, it seems to have been impossible to devise any effectual method by which witnesses committing the most evident perjury, or those engaged in inducing such witnesses to commit perjury, can be made accountable. But what the courts can do is to see to it that its officers who appear for the various parties to these controversies shall have no hand in this bribery of wit-

nesses or subornation of perjury, and to hold its officers, the attorneys who appear for the parties to a litigation and represent them on the trial of cases, to a strict accountability for their acts in relation to the litigation that comes before the court.

[2, 3] It will not do for an attorney who seeks to justify himself against charges of this kind to show that he has escaped criminal responsibility under the penal law, nor can he blindly shut his eyes to a system which tends to suborn witnesses to produce perjured testimony, and to suppress the truth. He has an active affirmative duty to protect the administration of justice from perjury and fraud, and that duty is not performed by allowing his subordinates and assistants to attempt to subvert justice and procure results for his clients based upon false testimony and perjured witnesses. The seriousness of this case is that a large corporation, having an immense mass of litigation before the court, had adopted a system by which large sums of money were paid for the purpose of influencing witnesses who were to appear either on its own behalf or on behalf of its opponents, so that their testimony would be favorable to the respondent's client. It would appear that these investigators or detectives were under the immediate control of the respondent as the general attorney for the Metropolitan Street Railroad Company. To him they reported the result of their investigations, to him they presented their bills or statements of expenses that they had incurred in the performance of their duties, and it was his approval of the bills and accounts that enabled them to obtain the money which they claimed from the Metropolitan Street Railroad Company. When one of these investigators presented an account showing payments for a particular purpose, and asked for the respondent's approval of that account, he had an affirmative duty to perform to see to it that the money had been properly expended on behalf of his client, and that his client should make the repayments, and he also had a further duty to the court and to the public to see to it that his assistants who were employed by him to aid in the defense of these actions had not used the money of his client to obstruct the administration of justice or to induce false testimony from perjured witnesses.

[4] Where it appears upon the face of these vouchers that his subordinates had spent the money of his client to accomplish such results, it was his clear duty to the court and to the profession to do all that was possible to discourage such practices. He cannot escape responsibility for his acts by claiming an excess of work when he deliberately approved the application of his client's money for such purposes, and by that approval secured payment to the agents and investigators who had applied the money for the purpose indicated. We have again and again expressed our conception of the duty resting upon an attorney in relation to the procuring of false testimony and allowing perjured witnesses to give their testimony when the attorney knew it to be false (Matter of Hardenbrock, 135 App. Div. 634, 121 N. Y. Supp. 250; affirmed 199 N. Y. 539, 92 N. E. 1086; Matter of Schapiro, 144 App. Div. 1, 128 N. Y. Supp. 852; Matter of Flannery, 135 N. Y. Supp. 612, decided May, 1912); and in con-

struing the facts proved in this case we wish this to be borne in mind that we are not basing our determination alone upon finding this respondent guilty of approving any one of the specified payments that it is admitted he approved, but upon his general course of approving the conduct of these investigators and detectives who were acting under him, and in approving the payment by the railroad company of its money for the purposes disclosed by the various vouchers that he did approve. It is well to call specific attention to the fact that the approval of the respondent to these vouchers was not a mere pro forma approval upon which he was not expected to have personal knowledge, but the approval apparently was essential to the payment of the vouchers, and the railroad company depended upon his knowledge of the propriety of the payments to justify its applying the money for the purposes specified. It was proved that a considerable number of these vouchers were either partly or wholly in the respondent's own handwriting, and some of such vouchers were for payments which were the most objectionable. It is quite true that the respondent might not be chargeable with the actual payment of the money called for by the vouchers for the purposes specified; but by approving the vouchers he approved the application of the corporation's money to the purposes specified in the vouchers, and it made no difference as to the respondent's position whether or not these investigators or detectives had cheated the company in putting in vouchers for payments which had not in fact been made. We do not think it necessary to examine in detail the payments which were approved in these vouchers. A general statement of the character of these payments will be sufficient.

[5] The first subject to which attention will be called related to the charge of the improper payments by the respondent's detectives to the plaintiff's witnesses in actions against the railroad company. In connection with these payments, it must be remembered that the great mass of these claimants were poor people who had been injured in the operation of the railroad for which the respondent was the general attorney. Generally in cases of that character the witnesses are in humble walks of life to whom a small amount of money is of considerable importance. From these vouchers it would appear that these investigators or detectives were constantly in the habit of interviewing and working upon those who might be expected to be witnesses favorable to the plaintiffs in the support of their claims against the railroad company. Thus in one voucher an investigator was allowed for disbursements:

"Night work roping plaintiff and locating and interviewing his witness and learning strength of his case"—$18.25.

Another was for—

"suppers with plaintiff's witnesses and two men from P. O. Department, where he works, on February 16 and 17, and general incidentals in getting them right"—$16.50.

Another:

"Paid to plaintiff's two witnesses for their incidentals and lunches"—$7.50.

Another:

"Expended at night * * * with plaintiff's two witnesses, * * * and with their friends, for purpose of keeping them away from home"—$11.60.
"Their hotel bills, suppers and breakfasts"—$5.50.

Another:

"Expended with plaintiff's two witnesses on two evenings before trial of case in order to properly prepare for trial"—$8.

Again:

"Expenses of visit to Astoria, L. I., expenses there in search for and interviewing plaintiff's only witness, with detective from Long Island City who knew him; expenses in New York with them both during evening and morning, $18."

These are illustrations of the methods adopted by the railroad company's employés in getting at the plaintiff's witnesses, and from these vouchers a considerable sum of money seems to have been paid to those who were understood to be plaintiff's witnesses, or for their benefit. There could have been but one object in the expenditure of this money, and that was to break down as far as possible the plaintiff's case, to influence his witnesses favorably to the railroad company, or extort from them admissions or lay the foundation of testimony that would contradict their testimony. A considerable number of these vouchers represented disbursements to or with the defendant's witnesses by these investigators or detectives, and there seem to be many cases where sums of money were paid far in excess of any proper compensation to witnesses for the time lost in attending court. Thus on October 20, 1909, there was paid in the Nowak Case $335 to different witnesses, the amount paid to each ranging from $65 to $10. In another case $100 was paid to a witness for time lost and expenses attending court, and payments of $25 and $10 to witnesses were quite numerous. These, standing alone, might not justify action, but they tend to sustain the conclusion that the payments were made in these cases out of all proportion to the proper allowance to a witness for lost time or expenses in attending court.

There is then a series of payments made to court officers, clerks, and attendants by these investigators and detectives. In some instances these vouchers name a specific case in relation to which clerks or other officials were paid money by the respondent. In other instances no case is mentioned, but the expenses were called "general." Thus one clerk was paid $75 for "preparation of cases for trial." There are other charges of $150 and over which are specified as amount of special expenses for clerks, assistant clerks, etc., for a six months period from January to July. Payments to "Calendar Clerk, City Court," to "court attendants who remained in charge of jury," and general payments to court officers. According to these vouchers, a large number of the officials connected with the courts seem to have received either money or refreshments from these investigators or detectives, and amounts are allowed for "expense with jurors" and "expense with secretary of judge" and lunches with witnesses and

court officials. It certainly cannot be assumed that this respondent would have authorized payments of this kind without expecting that his client was to receive some advantage from his connection with these court officials, and if, in consequence of these payments, the defendant did receive advantage in relation to the litigation in the court, it was certainly at the expense of the adverse party. We have disciplined an attorney for having paid to the clerk of a court a sum of money for the purpose of influencing the clerk in placing a case upon the calendar (Matter of Boland, 127 App. Div. 746, 111 N. Y. Supp. 932); but here was not an isolated instance of a payment to a clerk, but a course of conduct continued for years in which the clerks and attendants and those engaged in assisting in the administration of justice became the recipients of constant gratuities from this corporation, the defendant in many cases before the court.

There are then among these vouchers payments to police officers, aggregating the total amount of over $650 to 34 policemen. Policemen are public officers, charged with public duties, and receiving from the public compensation for the services which they render. When accidents in the streets happen, they are either witnesses of the accident itself or appear upon the scene very soon after the accident, and are often important witnesses as to the particular facts in relation to the accident. Their official position gives them a credibility that in the trial of these cases is often of the utmost importance. And yet there are in the evidence before us the cases of 34 policemen who were paid various sums of money, amounting to $100, in a particular case, to each of two policemen who figured therein. It is noticed that in most of the cases in which these sums were paid the policemen were called as witnesses for the defendant. The pretense that these sums were paid to these policemen in looking up witnesses for the defendant, or in giving the defendant the correct names of the witnesses to the accidents as ascertained by them, is puerile. What the defendant railroad company wanted was the active co-operation of these police officers to defeat the plaintiff's claim, and whether these public officers were bribed for the purpose of giving false testimony or giving the defendant railroad company the advantage of ascertaining who the witnesses to the accident were, which information was withheld from the plaintiff, it was equally reprehensible. The respondent himself stated in answer to a question whether he meant that the police officers would not tell the truth if they did not get the money, "Well, they tell it more cheerfully when they are good-natured and friendly with the company than when they are antagonistic;" that it was intended to keep them good-natured and sympathetic with the defendant railroad company. With witnesses about to be called for a party on the trial, that explanation of the object for which this money was paid is quite suggestive. The payment of sums of money by a large corporation under such circumstances is most improper. It demoralizes the police force, justifies them in expecting payment for services which the law requires them to perform for the compensation which they receive from the public, and it was clearly the duty of any attorney, when any attempt was made to extort money by

public officers, to inform the public officials rather than by acceding to the demand to obtain the advantage of a public officer's assistance.

We then have a series of payments made to physicians for the plaintiffs in litigations against this railroad company, and many of these payments seem to us to be reprehensible. We recognize the importance on the trial of the testimony of a physician as to the plaintiff's injuries, and it is difficult to conceive any justification for a party to an action paying to the physician of the adverse party whose testimony is necessary to such party a sum of money for his special expenses, or for the acceptance by a reputable physician of such a payment from his patients' opponent. The referee calls special attention to the Nowak Case, where the case was once tried, and where the house surgeon of the hospital to which the plaintiff was taken was sworn as a witness for the plaintiff. Within a month after that trial the doctor who had thus been called as a witness for the plaintiff received a payment from the defendant of $100, and the orderly who attended the patient in the hospital received a payment of $25. The case was retried a few months later, when this house surgeon and orderly were both called as witnesses for the defendant, and the defendant received the verdict. There are also many payments to hospital employés, and the total amount paid to these doctors and hospital employés amounted to several hundred dollars. Certainly the act of the respondent in approving payments to physicians and employés of hospitals where a litigant had been taken after an accident, without the slightest evidence that these payments were for any expert or proper services rendered to the defendant, cannot be justified.

There then come a series of vouchers showing disbursements of quite large amounts of money, aggregating over $7,000, wherein no particular object for the disbursement of the money is stated. They all, however, relate to litigations. Sometimes the particular case is mentioned in the voucher, and sometimes the disbursements are called "general," all relating, however, to litigations in which the Metropolitan Street Railroad Company was involved. The payment of these sums of money by investigators or detectives employed to assist in the trial of actions, without specifying the purposes for which the payments were made, considering the detail with which the same investigators or detectives entered on other vouchers the specific purposes for which they asked reimbursement, is certainly suggestive. No satisfactory explanation as to why these large sums of money were paid to these persons, without a detailed statement of the purpose for which the money was used, is given. There is not even a statement as to the general purpose for which the payment was made, or the particular case in which it was expended, which would certainly have been the case if the reason for neglecting to state it was that the investigator had merely forgotten the use to which the money had been applied. What these investigators did with this large sum of money paid to them by the corporation, and what induced the corporation to pay such sums of money to employés of this kind engaged in such investigations, is not disclosed, and the explanation of the respondent in making these payments is certainly most unsatisfactory.

I have thus stated the general nature of the system established by this railroad company and carried out and operated by this respondent as its attorney in relation to the litigated cases which were before the court and involved claims against the respondent's client for damages. Under it the railroad company paid, through its attorney who appeared for it to defend actions against it, thousands of dollars in tampering with and attempting to influence those whom they expected would be the witnesses against it and the public officials connected with some of the tribunals which tried and disposed of the litigation against it. It was a system that deliberately conduced to bribery and subornation of perjury, and the respondent and those connected with him in making these payments could have had no possible justification in applying the railroad company's money in making these payments. It was not one isolated fact or a payment in one isolated action, but a system established by which the railroad company's employés were justified in spending the railroad company's money to defeat recoveries by methods which, if they did not fall directly within the criminal law, were designed to accomplish the purposes which the provisions of the criminal law were enacted to prevent. These investigators would deem themselves justified in expending money thus placed in their hands for the advantage of the defendant irrespective of the particular means used. And, when we see that these large sums of money were placed in their hands without requiring them to specifically account for the use that they made of the money, it would justify the assumption that it was to be used in any manner that was necessary to accomplish the defeat of those presenting claims against the company. The court cannot in this case, or any other case, lay down a line which separates the proper or improper expenditure of money in the prosecution or defense of a legal claim. The matter was discussed at length in the Matter of Schapiro, 144 App. Div. 1, 128 N. Y. Supp. 852. To procure the testimony of witnesses, it is often necessary to pay the actual expenses of a witness in attending court and a reasonable compensation for the time lost. It is often necessary to pay a reasonable fee to an expert in preparing to testify for a party in an action. And there are many incidental expenses in relation to the prosecution or defense of an action at law which can with propriety be paid by a party to the action. But, on the other hand, the payment of a sum of money to a witness to testify in a particular way, the payment of money to prevent a witness's attendance at a trial, the payment of money to a witness to make him "sympathetic" with the party expecting to call him. These are all payments which are absolutely indefensible, and which are really included in the general definition of subornation of perjury. The payment of a sum of money to a witness to "tell the truth" is as clearly subversive of the proper administration of justice as to pay him to testify to what is not true. The prevalence of perjury is a serious menace to the administration of justice, to prevent which no means have as yet been satisfactorily devised. But there certainly can be no greater incentive to perjury than to allow a party to make payments to its opponent's witnesses under any guise

or on any excuse, and at least attorneys, who are officers of the court to aid it in the administration of justice, must keep themselves clear of any connection which in the slightest degree tends to induce witnesses to testify in favor of their clients. The action of the respondent in controlling and managing a system which had a direct tendency to accomplish that purpose is one that we cannot too severely condemn. Attorneys, whether representing corporations or individuals, must clearly understand that any conduct which tends to participate in or approve the payment of money to witnesses or public officials to influence the administration of justice will be most severely condemned and considered a case for disbarment.

The respondent is not a young attorney, whose youth and inexperience would justify an inference that he did not understand or appreciate the necessary consequences of his acts. He was admitted to the bar in 1882, and thereafter was associated with well-known and reputable attorneys. He had defended various street railroad companies until 1893, when he was appointed attorney for certain street railroads, which were subsequently consolidated into the Metropolitan Street Railroad Company. Whether the respondent devised the objectionable method of meeting accident claims, or inherited and developed it, is immaterial. In either case he was equally culpable. When the respondent took charge of the affairs of the Metropolitan Street Railroad Company as the head of its legal department, and thereafter conducted the legal affairs for that company, he was under no obligation to continue or develop a system the tendency of which would be to subvert the administration of the law and directly tend to subornation of perjury. We cannot possibly justify conduct of this kind in an officer of the court, and it becomes our imperative duty to say that any attorney who takes part in such conduct should no longer continue a member of the profession.

The respondent is therefore disbarred. All concur.