Ethelyn Wheeler **HAMILTON** et al., as Co-Executors of Estate of Harold L. Hamilton, Deceased, Plaintiffs-Appellants,

v.

**GENERAL MOTORS CORPORATION,** Defendant-Appellee.

No. 72–1960.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 24, 1973.

Decided Dec. 17, 1973.

---

Francis J. McConnell, Chicago, Ill., for plaintiffs-appellants.

A. Leslie Hodson and Frank Cicero, Jr., Chicago, Ill., for defendant-appellee.

Before SWYGERT, Chief Judge, SPRECHER, Circuit Judge and GRANT, Senior District Judge.*

SPRECHER, Circuit Judge.

The primary question posed by this diversity appeal is when does the statute of limitations commence to run in regard to a claim for services performed by a major witness in complex litigation: when what turns out to be the last service is performed or later when the litigation is concluded? The answer requires the resolution of the more fundamental problem of whether public policy permits any compensation to be paid to a non-expert witness.

The executors' complaint to recover for the decedent's services was dismissed for failure to conform to the applicable statute of limitations. The district court found that the last act performed by the decedent was the affixation of his signature to a deposition in September, 1966, whereas the complaint had been filed on January 26, 1972, more than five years thereafter.

I

Harold L. Hamilton was one of the pioneers in the development of the diesel locomotive industry. In 1922, he formed Electro-Motive Engineering Corporation, which manufactured electrically-powered gasoline locomotives. In 1930, Electro-Motive was sold to General Motors Corporation in a stock transaction. Hamilton built and headed General Motors' diesel locomotive plant at LaGrange, Illinois. He held the title of Vice President of General Motors upon his retirement in 1955 at age 65.

By 1955, the diesel locomotive, which was virtually unknown in 1922, had entirely supplanted the steam engine, with General Motors' Electro-Motive Division capturing 85% of the locomotive market with total sales in excess of $200,000,000 annually.

Hamilton's compensation from General Motors from 1942 to his retirement in 1955 was $30,000 per year. His retirement benefits which commenced June 30, 1955, were only $13,800 annually; he was not required to perform any services for that sum.

In November, 1955, Hamilton testified before the Senate Kilgore Committee in

---

* Senior District Judge Robert A. Grant of the Northern District of Indiana is sitting by designation.

regard to the diesel locomotive industry; in 1957 the United States Department of Justice initiated an antitrust investigation; and, grand jury subpoenas were issued to General Motors in 1959. General Motors sought out and interviewed Hamilton at great length in 1957 and again in 1959.

General Motors was indicted under the antitrust laws on April 12, 1961. On May 25, 1961, the case was transferred from the Southern District of New York to the Northern District of Illinois, Eastern Division, on the ground of more convenient forum. A government civil anti-trust action was also filed on January 14, 1963, charging General Motors with monopolizing the diesel locomotive business and with violating Section 7 of the Clayton Act through acquisition of the Electro-Motive Corporation and the Winton Engine Company. The relief sought in the civil action was divestiture of the Electro-Motive Division located at LaGrange, Illinois.

After the filing of the criminal action in 1961, the General Motors' trial attorneys, who were located in Chicago, and corporate legal staff from Detroit again sought out and interviewed Hamilton, who was living in California. From February, 1962, to September, 1966, Hamilton performed the following services at the specific request of and for the benefit of General Motors: Building upon the Senate hearing testimony of Hamilton in 1955 and upon his interviews in 1957 and 1959, a comprehensive memorandum of his knowledge was developed by the trial lawyers. They met with Hamilton four times in late 1962 and early 1963, three times in California and once in Chicago, developing the basic statement. The criminal action was dismissed on December 28, 1964, without the necessity of Hamilton testifying.

Three additional meetings then took place in 1965 and early 1966, one in California and two in Chicago, aimed primarily at preparing Hamilton for his deposition, which was taken in California from March 22 through March 31, 1966 and comprised 692 pages. In April, Hamilton reviewed the transcript of his deposition and ultimately signed it in September, 1966.

In addition, throughout the period of 1962–1966 correspondence moved between Hamilton and the General Motors' attorneys, relating to details of his statement and ultimate deposition, and concerning exhibits, 79 of which were identified during the deposition. The complaint alleged that "Hamilton came out of his retirement and thereafter for approximately ten years regularly devoted substantially all of his time and effort in assisting GMC officials and counsel in this regard."

The civil action was dismissed on June 2, 1967. In May, 1969, Hamilton died. Thereafter his widow and daughter learned that he had not been compensated for these services except for out-of-pocket expenses. After some preliminary discussions with General Motors' representatives, this action was filed on January 26, 1972. Upon dismissal of the action as foreclosed by the applicable statute of limitations, the plaintiffs appealed.

II

The parties on appeal have concentrated narrowly upon the single question presented by the district court's judgment; that is, whether the statute of limitations commenced to run from the last service performed by the decedent or when the litigation was concluded on June 2, 1967, which latter date falls within the five year statutory period.[1]

1. The district court held that the statement of claim for relief was barred by Illinois Revised Statutes, 1971, chapter 83, § 16 which provides in pertinent part that "actions on unwritten contracts, expressed or implied . . . and all civil actions not other-

wise provided for, shall be commenced within 5 years after the cause of action accrued."

The defendant also argued in the district court and on appeal that, in the alternative, the action was barred by a California two-year statute of limitations (Cal.Code Civ.

We believe that the resolution of this appeal requires a much broader consideration of the important policy considerations underlying the alleged implied contract which the complaint sought to enforce. There was no express contract or agreement or understanding that Hamilton would be paid for his assistance to General Motors; he never requested any payment; he was never promised any payment; and he never told the members of his family that he expected to be paid. The plaintiffs in seeking payment relied upon an implied contract: "where one person, in the absence of any express agreement, renders valuable services to another which are knowingly accepted by such other, the law will imply a promise to pay a fair and reasonable compensation for such services." Highway Commissioners v. City of Bloomington, 253 Ill. 164, 172, 97 N.E. 280, 284 (1912).

Hamilton rendered services to General Motors and they were valuable.[2] He prepared himself mightily and at length, first in anticipation of being a witness at the trial of the criminal case and later, when that case was dismissed in 1964, in anticipation of testifying upon deposition.[3] His efforts were at least partially responsible for the ultimate dismissal of the civil suit in 1967.[4]

In seeking to avoid the impact of the Illinois limitations statute, the plaintiffs have relied principally upon two Illinois cases relating to attorneys' claims for services which held that the causes of action did not accrue until the litigation terminated. Walker v. Goodrich, 16 Ill. 341 (1855); Meyer v. McCumber, 75 Ill.App. 119 (1st Dist., 1898).[5] The ra-

Proc. § 339) by virtue of Illinois' "borrowing" statute, which applies "[w]hen a cause of action has arisen in a state . . . out of this state . . . ." Ill.Rev.Stat. 1971, ch. 83, § 21.

A federal court in a diversity action is required to apply the conflict of law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Illinois would probably follow the "most significant relationship" test. Earle, Conflict of Laws and the Second Restatement—Illinois Accepts the Tort Provisions; What about Contracts?, 61 Ill.Bar.J. 292 (1973). Inasmuch as the implied contract alleged here related to a lawsuit pending in Illinois, Illinois undoubtedly had the most significant relationship to that contract. Consequently, it can not be said that the district court was clearly erroneous in the implicit finding that the Illinois "borrowing" statute would not apply because the cause of action "arose" in Illinois.

2. Both at the time he testified on deposition and later after the filing of this suit, the Chicago trial lawyers, the corporate legal staff members and General Motors officials were unstinting in their praise of Hamilton's knowledge, ability and performance as a deposition witness. The lavishness of this praise culminated when the attorneys endorsed Hamilton's copy of the deposition transcript as follows:

". . . And for us who had the job of seeing that the story was told in the defense of the locomotive case, we know, and wish here to declare, that these pages record one of the most remarkable feats of testimony we have ever been privileged to attend, not only in accuracy, detail and sharpness of recollection of thirty years of history, the clarity of expression, and the tremendous knowledge and understanding manifested, but in the solid impression—favorable to our cause—made upon opposing counsel, which we are confident played a large part in the ultimate successful outcome."

3. Hamilton wrote to the chairman of the board of General Motors in 1966: "The tiring part has been the several years of continuous and repeated review of all important phases of the development 'from 1922 to 1943."

4. The reason for taking Hamilton's desposition was to perpetuate his testimony at a time when his health was failing, but also because the lawyers were "hoping to psychologically demoralize . . . the Government with the force of Mr. Hamilton's testimony" (Nitschke dep., 90). "[W]e hoped that Mr. Hamilton's deposition would be so persuasive that government counsel would decide to dismiss the case" (Abrams dep., 50–51). And apparently that is what happened on June 2, 1967.

5. The plaintiffs further relied upon two opinions by Judge Learned Hand (Potts v. Village of Haverstraw, 93 F.2d 506, 110 F.2d 58 (2nd Cir. 1937, 1940)), in the second of which he said at 60:

"We said that he [a civil engineer] was in the same position as an attorney, who

tionale for those holdings was expressed by the Illinois Supreme Court in *Walker*, 16 Ill. at 343:

"No other case than this could be required to illustrate the propriety of this rule. Here was a suit pending in court for more than twelve years, during all of which time the defense was conducted by these solicitors, with great ability, and the most constant assiduity, requiring, at one time, an almost constant attendance before the master, for about nine months, in stating the accounts of a partnership involved in that suit. Did the statute of limitations commence running at the termination of each day, as to the services rendered on that day? Were the solicitors obliged to pause in their defense, within each period of five years, to commence a suit against their clients for the services already performed, or forfeit them? The very statement of the proposition shows how embarrassing, inappropriate, and indeed, impracticable, such a rule would be."

In order to determine whether the attorney rationale should be applied to Hamilton, it should be noted that recently the Illinois Appellate Court held in Otto v. Kropp, 105 Ill.App.2d 464, 245 N.E.2d 516 (1st Dist., 1969), that although there was an earlier suspension of services performed by an accountant on a specific tax audit, his claim for services did not accrue for limitations purposes until the litigation involving that audit had terminated. That case, in effect, applied the litigation-termination theory to an expert witness as well as to attorneys. Also, Hamilton was never told at the termination of his deposition or at any other time that his services were no longer required. As far as he knew, he could have been called upon as a trial witness or as a trial consultant if the civil case against General Motors ever went to trial.

Unfortunately for the plaintiffs here, however, Hamilton was not an expert witness and that fact brings into play a host of countervailing public policy. We start with the proposition that Hamilton was called into service because of his vast knowledge of the subject matter of two lawsuits then pending in the federal courts.[6] The federal policy regarding federal witnesses is so positive that it provides (18 U.S.C. § 201(i)):

"Whoever, directly or indirectly, asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of the testimony under oath or affirmation given or to be given by him as a witness upon any such trial, hearing, or other proceeding, or for or because of his absence therefrom—

"Shall be fined not more than $10,000 or imprisoned for not more than two years, or both."

The above language "shall not be construed to prohibit the payment or receipt of witness fees provided by law, or the payment, by the party upon whose behalf a witness is called and receipt by a witness, of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding, or in the case of expert witnesses, involving a technical or professional opinion, a reasonable fee for time spent in the preparation of such opinion, and in appearing and testifying" (18 U.S.C. § 201(j)).

The policy expressed in 18 U.S.C. § 201 is also a common law policy (14 Wil-

need not sue until the job is over; that is, until he has been discharged, or otherwise learns that he will not be required to do anything more. The village never informed the plaintiff that his employment was at an end until February 10, 1931, and he had no reason to speculate as to whether it would further prosecute the application to the commission and go on with the work."

6. United States v. General Motors Corporation, 61 Cr. 356 (S.D.N.Y.), transferred on May 25, 1961 to the Northern District of Illinois, Eastern Division; United States v. General Motors Corporation, 63 C 80 (N.D. Ill.).

liston on Contracts § 1716 (3rd ed. 1972)):

"As it is the duty of a citizen, when required to do so, to testify in court concerning facts within his knowledge for the compensation allowed him by law, a bargain to pay one who is amenable to process a further sum for his attendance as a witness is invalid both on grounds of public policy and for lack of consideration."

See also, Restatement of Contracts § 552(1) (1932); 6A Corbin, Contracts § 1430 (1952); Calamari & Perillo, Contracts § 369 (1970).

In Wright v. Somers, 125 Ill.App. 256 (1906), a witness demanded $200 for his loss of time and a jury awarded him that amount. In reversing the judgment, the Illinois Appellate Court said at 257–258:

"We cannot affirm this judgment. The contract upon which it is based is against public policy. If affirmed, it would give ground for witnesses to extort unreasonable fees for their testimony; and might make it impossible for a poor suitor to obtain his rights.

"It is against the spirit of our Constitution, which says: 'Every person ought to find a certain remedy in the laws for all injuries and wrongs which he may receive in his person, property or reputation; he ought to obtain, by law, right and justice freely and *without being obliged to purchase it*, completely and without denial, promptly and without delay.' Section 19, Article II.

"The legislative department of our State has declared that every witness attending in his own county upon trials in the courts of record shall be entitled to receive the sum of one dollar for each day's attendance and five cents per mile each way for necessary travel. Section 47, chapter 53, R. S. Hurd. This is all the witness is entitled to receive. To demand more is forbidden by the policy and spirit of this statute.

"If a witness, who knows a fact material to the issue in the cause, either before or after the service of a subpoena upon him, can traffic with the suitor, who desires to call him, as to the value of his testimony, and then call upon the courts to enforce the contract thus made, the tendency to evil consequences is apparent. Such a ruling leans toward the procurement of perjury; toward the raising up of a class of witnesses who, for a sufficient consideration, will give testimony that shall win or lose the lawsuit, toward the perversion of justice; and toward corruption in our courts.

"We are not charging that any of these dangerous consequences happened in this case. It does not appear but that appellee when called in the damage case testified simply and purely to the truth. But the affirmance of this judgment would so clearly tend to evil consequences that we must declare the contract upon which it is founded void as against public policy. Walker v. Cook, 33 Ill.App., 561; Gillett [Gillet] v. Board of Supervisors, 67 Ill., 256; Dodge v. Stiles, 26 Conn., 463; Quirk v. Muller, 14 Mont., 467 [36 P. 1077].

"The alleged contract is without consideration. When subpoenaed one is bound to attend the trial, and there to submit himself to an examination upon the facts in issue."[7]

Although Hamilton may have been one of the foremost experts in regard to some of the matters as to which he had

7. The Code of Professional Responsibility became effective for American Bar Association members on January 1, 1970, after the services involved here took place, but it codified prevalent ethical standards and public policy. Ethical Consideration 7–28 provides: "Witnesses should always testify truthfully and should be free from any financial inducements that might tempt them to do otherwise. A lawyer should not pay or agree to pay a non-expert witness an amount in excess of reimbursement for expenses and financial loss incident to his being a witness; however, a lawyer may pay or agree to pay an expert witness a reasonable fee for his services as an expert."

first-hand knowledge and although he may have devoted as much if not more time than an ordinary expert witness would have spent in the preparation of his anticipated testimony, the fact was that he was testifying to matters of his own personal knowledge. Although he was not a party to the lawsuits, his past interest in the subject-matter was such that he could not have qualified as a disinterested, independent or impartial expert.

While in a particular case such as this it may seem unfair for a non-expert witness to be expected to prepare and testify under such strict limitations upon his reimbursement when expert witnesses in the same case are substantially compensated, we can not say that the strong public policy considerations which dictate that result are not warranted in the over-all interest of justice.

Consequently, we conclude that the services of non-expert witnesses are not analogous to lawyers or even to expert witnesses. Inasmuch as the kinds and amounts of reimbursement to which such witnesses are entitled are so severely circumscribed, the only contract that the law could imply would be for "reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance" (18 U.S.C. § 201(j)).[8]

These reimbursable items could only accrue as expended; there could be no implied agreement for any lump-sum payment at the end of the litigation as in the case of attorneys' fees. Hamilton in fact reported his reimbursable expenses as they were incurred, and he was reimbursed.[9] He was thus put on notice that reimbursements were being made from time to time. If he had any additional claims (for lost time, for example), he had an opportunity to make

them as the time was expended. None of the reasons for treating attorneys' services differently for limitations' purposes applies to the services of the non-expert witness.[10]

Therefore we predict that if the courts of Illinois were confronted with this question they would hold as the district judge held in this case.

Judgment of dismissal is affirmed.

Affirmed.

---

8. In Illinois, loss of time may not be reimbursable under Wright v. Somers, 125 Ill. App. 256 (1906).

9. Hamilton reported expenses of $95.58 in 1962; $229.77 in 1963; $896.96 in 1964; and $583.12 in 1965; or a total of $1,805.43.

This was broken down into $839.67 for transportation, $280 for meals and $685.76 for lodging (Nitschke dep. Ex. 75).

10. Not even the "embarrassment" of commencing frequent suits against a client. Walker v. Goodrich, 16 Ill. 341, 343 (1855).