REVISED, June 24, 1998

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 97-60114

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

THERMON HEAT TRACING SERVICES, INC.

Respondent.

On Application for Enforcement of an Order
of the National Labor Relations Board

June 3, 1998

Before EMILIO M. GARZA, STEWART, and DENNIS, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This case is before us on the application of the National Labor Relations Board ("NLRB") for the enforcement of an order issued against Thermon Heat Tracing Services, Inc. ("Thermon").[1] The NLRB held that Thermon engaged in an unfair labor practice by using the guise of workplace safety to thwart union activity at one of its job sites. The NLRB found that the safety rule itself did not violate the National Labor Relations Act ("the Act"),[2] but that the discriminatory manner in which it was enforced against union members was in violation of the Act. For the following reasons we enforce the NLRB's order.

---

[1] The NLRB's order is reported at 320 NLRB 1035 (1997).

[2] 29 U.S.C. § 151 et seq.

BACKGROUND

In 1993, Brown and Root Braun ("Brown and Root") was selected as the general contractor for the expansion of Texaco's gasoline additive plant in Port Neches, Texas. Respondent Thermon, an electrical contractor, was chosen as one of Brown and Root's subcontractors. Thermon, which was responsible for installing the electrical heat tracing system, employed about 100 of the approximately 3000 workers at the Texaco site.[3] Thermon's employees at the facility were represented by Local 479 of the International Brotherhood of Electrical Workers ("Local 479").

On March 2, 1995, Local 479 initiated a recognitional strike among Thermon's craft employees. Fifty-two (52) of the 57 craft employees went on strike for recognition.

On March 10, while the strike was in progress, Brown and Root issued a directive to all of its subcontractors at the Texaco project, which stated:

> With the impending opening of B and C Streets in the East plant, as well as future early turnover of Blocks 5-8, it is requested that each subcontractor require their employees to remain in their designated work areas and not travel around in other areas of the project. These particular areas are permit areas and require special training to enter. Your cooperation is appreciated.

On March 12, Thermon's Safety Director, Paul Wagstaff, responded to this directive by issuing the following safety rule to its employees:

> In order to maintain a safe, continual and productive work force, it is necessary that all craft personnel remain in their assigned work areas.
>
> This mandate will commence this date and shall include all breaks and on the job lunch periods.
>
> This program will assist foremen as to the whereabouts of their employees should an emergency arise now that Brown & Root Braun is beginning to utilize corrosives with the flushing of pipelines.
>
> We all should realize that additional changes may occur as our project changes from a "grass root' job to a gradual "live unit".
>
> As always your continued support is appreciated.

---

[3]These workers included employees of the general contractor, Brown and Root, and the other subcontractors on the site.

2

Under the new safety rule, an employee could visit another work area if he had permission from his foreman and if the foreman of the other work area knew that the employee would be visiting. Employees who violated this rule were to be issued a written warning in the first instance. A second violation would result in termination. Thermon eventually terminated fifteen (15) employees for violating the safety rule.

During the strike, Walter McNeely, a paid union informant, was hired by Thermon.[4] Thermon was unaware of McNeely's membership in the union. McNeely testified that he frequently left his work area during lunch without seeking his foreman's permission. Moreover, McNeely told the NLRB of four occasions on which he was seen outside of his work area by those that the NLRB found to be supervisors on the site or agents of Thermon. On the first occasion, McNeely encountered Safety Director Paul Wagstaff. They spoke, but nothing was said about the fact that McNeely was out of his work area. On the second occasion, McNeely saw and spoke with Doug Brookshire, the site Superintendent while McNeely was outside of his work area. Again, McNeely was not challenged about his failure to comply with the safety rule. McNeely also encountered another Superintendent, Todd McMain, while he was outside of his work area. Again, no action was taken against McNeely for violating the safety rule. Finally, McNeely encountered Thermon's General Foreman, Tom Maydian while McNeely was away from his assigned work area. Just as before, McNeely was not disciplined for failing to comply with the safety rule.[5]

In addition to never having been disciplined for violating the safety rule, McNeely testified that, before the strike ended, he overheard Wagstaff saying that he intended to use the new safety rule

[4]The union paid McNeely $2 per hour for up to 40 hours per week to keep it informed of happenings on Thermon's Texaco job site. McNeely testified that this was his first paid informant assignment for the union and that he kept a log and twenty pages of notes of his observations through the end of the construction. He reported his observations to union organizers Chris Kibbe and Larry Moore on a weekly basis. Thermon did not object to McNeely's competency to testify before the Administrative Law Judge nor has it raised his competency as an issue on appeal.

[5]McNeely was terminated approximately two weeks after he was hired by Thermon. However, his firing was not because he violated the safety rule by leaving his work area without permission to visit other work areas but because he had left the job site altogether to go fishing according to his unrebutted testimony. He was rehired by Thermon shortly thereafter.

to discipline union members who were distributing union literature outside of their assigned work areas. He also testified that, while seated near a Thermon foreman at lunch, he heard Thermon foremen talking on walkie-talkies and warning each other that "union people" had left their assigned blocks and were on their way.

On March 17, the strike was called off and Local 479 made an unconditional offer for the strikers to return to their jobs. When the strikers returned to work in April, Wagstaff gave them a safety briefing and a copy of the new safety rule.

Between April 11 and April 27, Thermon issued warnings to fifteen employees who violated the new safety rule. These fifteen employees had all previously been on strike. Each of these employees claims to have been engaged in union activities when he was cited for violating the safety rule. All fifteen were discharged shortly after receiving the initial warning for violating the rule a second time. The NLRB found that Thermon was aware of the union affiliation of the fifteen employees who were fired for violating the safety rule and that, therefore, these fifteen terminations resulted from the rule's being enforced in a discriminatory manner against union activists.

STANDARD OF REVIEW

We will uphold the NLRB's decision if it is reasonable and supported by substantial evidence. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456 (1951); Trencor, Inc. v. NLRB, 110 F.3d 268 (5th Cir. 1997). The Supreme Court has defined substantial evidence as "more than a scintilla . . . . [S]uch relevant evidence as a reasonable mind would accept to support a conclusion." Universal Camera, 340 U.S. at 477. In determining whether the NLRB's factual findings are supported by the record, we do not make credibility determinations or reweigh the evidence. NLRB v. Cal-Maine Farms, 998 F.2d 1336, 1339-40 (5th Cir. 1993) (citing cases). "'Recognizing the Board's expertise in labor law, we will defer to plausible inferences it draws from the evidence, even if we might reach a contrary result were we deciding the case de novo.'" NLRB v. Turner Tool & Joint Rebuilders Corp., 670 F.2d 637, 641 (5th Cir. 1982) (quoting TRW, Inc. v. NLRB, 654 F.2d

4

307, 310 (5th Cir. Unit A Aug. 1981)) ; see also NLRB v. Great Western Coca-Cola Bottling Co,

740 F.2d 398, 404 (5th Cir. 1984) (on review, this Court accords "great deference" to the NLRB's

findings of fact). However, in assessing whether the evidence in the record is substantial we must

consider the facts that militate or detract from the NLRB's decision as well as those that support it.

TRW, 654 F.2d at 310. The NLRB's legal conclusions are reviewed de novo.

## DISCUSSION

Thermon argues that there is insufficient evidence supporting the NLRB's findings in this

matter. In particular, Thermon urges the following: (1) that Tom Maydian and Paul Wagstaff

were not "supervisors" under the Act and, therefore, their actions cannot be imputed to Thermon,

(2) that Thermon did not apply its safety rule in a discriminatory manner, and (3) that Thermon

had no knowledge of the union activities of the dismissed employees.

## I. Tom Maydian and Paul Wagstaff

McNeely testified that both General Foreman Tom Maydian and Safety Director Paul

Wagstaff observed and acknowledged him during periods when he had, without permission, left his

work area during his lunch break and visited other areas. Thermon contends that while Maydian and

Wagstaff may have observed McNeely violating the safety rule, their observations are immaterial

because they were not supervisors under the meaning imputed to this term by Section 2(11) of the

Act, which defines "supervisor" as follows:

> any individual having authority, in the interest of the employer, to hire,
> transfer, suspend, lay off, recall, promote, discharge, assign, reward, or
> discipline other employees, or responsibility to direct them, or adjust their
> grievances, or effectively recommend such action, if in connection with the
> foregoing exercise of such authority is not of a merely routine or clerical
> nature, but requires the use of independent judgment.

Superintendent Brookshire, testified that Maydian was "an electrical supervisor" who had

authority to run crews, and to direct and reprimand employees. This testimony supports the NLRB's

finding that Maydian was a "supervisor" under the Act.

5

The NLRB found that Wagstaff, on the other hand, was not a supervisor. Rather, the NLRB held that he was an agent of Thermon. It is, however, unnecessary for Wagstaff to have been a supervisor in order for his knowledge to have been imputed to Thermon. Rather, an agent's violation of the Act is sufficient for said violation to be imputed to the employer. See Atlas Minerals, 256 NLRB 91, 96 (1981); Uniontown Hosp. Ass'n, 277 NLRB 1298, 1303 (1985). Moreover, as the NLRB points out, Wagstaff testified that he was "the safety professional" for Thermon and that his "duty was to assist in promoting, providing, and maintaining a safe work environment" at the company. Given these functions, Wagstaff was reasonably seen as Thermon's agent, and thus, Thermon was responsible for his actions.

Given Maydian's and Wagstaff's status as supervisor and agent respectively, it was reasonable and proper for the NLRB to impute knowledge of McNeely's activities to Thermon.


II. Discriminatory Application of the Safety Rule

Under Section 8(a)(3) of the Act, it is an unfair labor practice for an employer to discriminate against employees with regard to terms or tenure of employment for the purpose of discouraging membership in a labor organization. When an employer has no legitimate reason to discharge an employee and employs a pretextual reason, we use a very lax standard to determine whether the employer has violated § 8(a)(3). See NLRB v. Adco Elec., Inc., 6 F.3d 1110, 1116 (5th Cir. 1993) ("Where it is shown via direct or circumstantial evidence that anti-union considerations were a 'motivating factor' in an employer's decision to discharge an employee, the employer has violated the Act."). Thus, an employer violates section 8(a)(3) by discharging employees because of their union activity. See id.; NLRB v. Transp. Management Corp., 462 U.S. 393, 397-98 (1983); NLRB v. Delta Gas, Inc., 840 F.2d 309, 313 (5th Cir. 1988). The critical inquiry in these cases is the employer's motive. Id.

In this case, however, the NLRB found that Thermon's safety rule was legitimate rather than merely pretextual. Therefore, rather than falling under the above-described "pretextual reason

6

doctrine," this case falls under the "dual-motive doctrine," which this Court described in TRW, Inc. v. NLRB, 654 F.2d 307, 311 (5th Cir. Unit A Aug. 1981). In TRW, we stated that "when the employer advances a legitimate reason for the discharge, and it is not shown that this reason is untrue, the case cannot be characterized as a pretext case but must be considered as a 'dual-motive' case." Id. at 311-12; see also Roscello v. Southwest Airlines Co., 726 F.2d 217, 222 (5th Cir. 1985); Marathon LeTourneau Co. v. NLRB, 699 F.2d 248, 252 (5th Cir. 1983). The required analysis for dual-motive cases was set forth in Wright Line, a Division of Wright Line, Inc., 251 N.L.R.B. 1083 (1980), enf'd 662 F.2d 899 (1st Cir. 1981), cert. denied, 445 U.S. 989 (1982), approved in Transp. Management Corp., 462 U.S. at 393 and adopted by this Court in our decision in NLRB v. Ryder/P.I.E. Nationwide, Inc., 810 F.2d 502, 507 (5th Cir. 1987). Under this analysis, the General Counsel bears the initial burden of proving that an activity protected under the Act was a substantial factor in the employer's decision to discipline or terminate the employee or employees in question. If this burden is met, the burden shifts to the employer to prove affirmatively that the disciplinary or termination decision would have been the same in the absence of the protected conduct. Id.

Applying the foregoing law, McNeely testified that he overheard Wagstaff saying that he intended to use the new safety restriction against employees who were distributing union literature. Moreover, McNeely heard various foremen warning each other to keep track of "union people" who were visiting other blocks during breaks. McNeely's testimony is supported by the Administrative Law Judge's ("ALJ") evaluation of Superintendent Brookshire, who he noted "seemed reluctant to explain how supervisors enforced Thermon's restriction on employee movement between blocks." The ALJ found this reluctance to be especially damaging because Brookshire had signed many warning and discharge slips for union employees who were subsequently fired. This reluctance to explain how the rule was applied and inability to explain whether the rule was applied to non-union employees also created the impression that the rule was "more honored in the breach than in the observance." See NLRB v. Turner Tool & Joint Rebuilders, 670 F.2d 637, 639 (5th Cir. 1982) (finding a violation of the Act where evidence has indicated that the workplace rule, though

7

legitimate, was "more honored in the breach than in the observance"). In contrast to Brookshire's demeanor, the ALJ explicitly found McNeely to be a frank witness, thereby leading him to credit McNeely's testimony over Brookshire's testimony.

Other evidence is more mixed. Thermon argues that it also enforced the safety rule against employees Ronnie Bell and Clay Marshall, who were not distributing union materials, although the ALJ found that it was unclear whether they had been on strike. Thermon also argues, and the ALJ specifically found, that Thermon granted one worker permission to go to another work block to distribute union materials. Both parties stipulated, however, that on at least one other occasion, Thermon specifically denied a worker permission to go to another work block to distribute union materials.

Careful examination of the record is all the more called for when resolution of the case depends on witness credibility. In such cases, special deference must be paid to the ALJ's conclusion. See e.g., Centre Property Management v. NLRB, 807 F.2d 1264, 1269 (5th Cir. 1987) (giving great deference to the ALJ's credibility assessments of witness testimony in the presence of substantial circumstantial evidence and the absence of direct evidence of anti-union animus). The ALJ's resolution of the credibility findings adverse to Thermon coupled with strong evidence of anti-union animus by Thermon convinces us that substantial evidence supported the ALJ and the Board's determination that Thermon discriminatorily applied its safety rule against union employees.

III. Thermon's Knowledge of Dismissed Employees' Union Activities

In his decision, the ALJ noted that the parties had stipulated to the fact that the fifteen employees who were terminated for violating the safety rule were all engaged in union activity at the time of the violations. Thus, there is no question of Thermon's knowledge of the dismissed employees' union activities. However, as the NLRB noted in its decision and order, the ALJ erred in including five of the fifteen dismissed employees in the stipulation. These five employees -- Joe Duhon, Jason Carr, Ken Tyson, Randy Garner, and Rodney Bernard -- though dismissed for violating

8

the safety rule, were not part of the stipulation. We must, therefore, determine whether our analysis in Part II of this opinion applies to the five dismissed employees who were not included in the stipulation.

> Despite the ALJ's error, the NLRB held:
>
> Although the stipulation does not include these names [Duhon, Carr, Tyson, Garner, and Bernard], the record established that they were former strikers who engaged in union activity, that the Respondent [Thermon] was aware of this, and that the Respondent issued warnings to them and discharged them because of that activity.

McNeely testified that a number of the dismissed employees distributed union literature during their lunch breaks. He did not mention each of the fifteen dismissed employees by name. Rather, he named seven employees and then stated that he could not remember the names of the others.[6] Thermon argues that because such testimony was not presented for each dismissed employee, those employees not included in the stipulation cannot be considered discriminatees in this case.

Thermon's argument must fail because this Court has held that where a discharge is motivated by antiunion animus, the union sympathies of each affected employee need not be shown. See Dillingham Marine & Manufacturing Co. v. NLRB, 610 F.2d 319, 321 (5th Cir. 1980) (a finding by the NLRB that a mass layoff decision itself is motivated by union activity "necessarily constitutes a finding that each individual discharge was caused by union activity"). As we have noted above, an employer can be in violation of the Act even where the work rule in question is valid, if said work rule is applied in a discriminatory manner. See Turner Tool and Joint Rebuilders Corp., 670 F.2d at 641. We have established that there is substantial evidence that Thermon, through its appointed supervisors and agents, discriminatorily applied its safety rule against union activists. We agree with the NLRB that the record establishes Duhon, Carr, Tyson, Garner, and Bernard's status as "former strikers who engaged in union activity." Circumstantial evidence is sufficient in satisfying the General Counsel's burden in dual-motive cases. See e.g., Center Property Management, 807 F.2d at 1269.

---

[6]Of the seven names that McNeely could remember, one was that of Ken Tyson, a dismissed employee who was not included in the stipulation.

9

In light of Thermon's apparent awareness of the five employees' union activities, and in light of Thermon's policy of discriminatorily applying its legitimate safety rule to union activists, we agree with the NLRB's conclusion regarding the firing of the five employees not included in the stipulation. Accordingly, we enforce the NLRB's order as to all fifteen terminated employees.